1

1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF MARYLAND
2                            NORTHERN DIVISION

3


4        UNITED STATES OF AMERICA

5             v.                              CRIMINAL CASE NO.
                                                JFM-09-0560
6        LEWIS KEVIN LUCAS,

7             Defendant
         _____/
8

9

10                        (Motions Hearing)
                          Friday, April 23, 2010
11                        Baltimore, Maryland

12

       Before:  Honorable J. Frederick Motz, Judge
13

14


15     Appearances:

16           On Behalf of the Government:
              Clinton J. Fuchs, Esquire
17

18           On Behalf of the Defendant:
              Katherine T. Newberger, Esquire
19            Brendan A. Hurson, Esquire

20

21

22     Reported by:
       Mary M. Zajac, RPR
23     Room 5515, U.S. Courthouse
       101 West Lombard Street
24     Baltimore, Maryland 21201

25

2

1          (Proceedings at 3 p.m.)

2          THE COURT:  We're having a rather confusing day here

3     because of the inoperability of my courtroom.  So I do apologize

4     to everyone for the logistics.

5          Mr. Fuchs, if you'll call the case, please.

6          MR. FUCHS:  Yes, Your Honor.  United States of America

7     versus Lewis Lucas, Criminal Case Number 09-CR-0560.  This matter

8     is set for a motions hearing.  Clint Fuchs for the United States.

9     With me at counsel table is John Hayden from ATF.

10         THE COURT:  Yes, nice to see you, Mr. Fuchs.  And good

11    afternoon, Mr. Hayden.  Nice to see you.  And on behalf of the

12    defendant?

13         MS. NEWBERGER:  Thank you, Your Honor.  Good afternoon.

14    Katherine Newberger and Brendan Hurson from the Office of the

15    Federal Public Defender.  With us is Mr. Lucas.

16         THE COURT:  Good afternoon, Mr. Lucas.  Nice to see

17    you, sir.  And good afternoon, Ms. Newberger.  And Mr. Hurson,

18    nice to see you.

19         Mr. Hurson, I understand there's a new member of our

20    Criminal Justice panel that you're going to have to counsel.  Is

21    that right?

22         MR. HURSON:  That's correct, Your Honor.  He's going to

23    need a lot of work.

24         THE COURT:  Yeah, I think he's going to need a lot of

25    work.  I'm glad to see that he's still got the bat in his hand

3

1      and I'm sure you can teach him the strokes again.

2                  MR. HURSON:  I definitely will.  Thank you, Your Honor.

3                  THE COURT:  All right.  Thank you very much.  Reference

4      being made to Mr. Hurson's father, who is much, much older than

5      me but I knew him many years ago.  He's going to be taking

6      court-appointed cases as well.  I look forward to seeing him.

7                  We are here on, first of all, we have a pending motion

8      to suppress evidence here, which is, have the docket sheet in

9      front of me, it is paper number, Paper Number 16, I believe.  Is

10     that correct?

11                 THE CLERK:  You can have my report.

12                 THE COURT:  Thank you.  Just take a look.  I think it's

13     Paper Number 16 is the only pending motion of which I'm aware.

14     And that's a motion to suppress tangible and derivative evidence

15     still pending before the Court, Paper Number 16.  Is that the

16     only motion pending from the point of view of the defense, Ms.

17     Newberger?

18                 MS. NEWBERGER:  Yes, it is.

19                 THE COURT:  Is that correct, Mr. Fuchs, from your point

20     of view?

21                 MR. FUCHS:  Yes, it is.

22                 THE COURT:  All right.  The government, bearing the

23     burden of proof, may present testimony and evidence.  We're ready

24     to proceed with the motions hearing.

25                 MR. FUCHS:  Thank you, Your Honor.  The government

1    calls Officer Patrick Huter.

2              THE COURT:  By the way, before I forget.  Hold on just

3    one second, Detective.  By letter of April 21st to counsel, I

4    noted that I have reviewed the internal investigation files,

5    internal investigation division files from the Baltimore City

6    Police Department relating to Officers Patrick Huter and Fabien

7    Laronde, which were submitted to me for my review in camera ex

8    parte, and with respect to any review of material that might fall

9    within the ambit of Giglio v. United States, 405 U.S. 150, the

10   1972 Supreme Court opinion establishing the criteria pursuant to

11   which evidence tending to impeach a witness must be disclosed to

12   defense counsel.

13             Defense counsel and the government both have received a

14   copy of that letter.  Is that correct, Ms. Newberger?

15             MS. NEWBERGER:  Yes.

16             THE COURT:  Correct, Mr. Fuchs?

17             MR. FUCHS:  Yes, Your Honor.

18             THE COURT:  All right.  Now, Mr. Fuchs, with respect to

19   the files themselves, I indicated in the letter, whereas I didn't

20   disclose any information or find any information to be within the

21   ambit of Giglio as to Officer Huter, that there was some

22   information as to Officer Laronde, if I'm pronouncing his name

23   correctly, having reviewed 25 Internal Investigation Division

24   files, that some information I felt should be given to defense

25   counsel.  I summarized that information.

5

1          The files themselves are not being made available to

2     defense counsel.  They are in my chambers.  At the conclusion of

3     today's suppression hearing, we're scheduled for a pretrial

4     conference, I believe, are we not?  No, we're not?

5          MS. NEWBERGER:  No, Your Honor.  I believe the pretrial

6     conference has been moved.

7          THE COURT:  All right.  That's right.  The pretrial

8     conference is now scheduled for July the 14th and the trial of

9     this case is scheduled for July the 19th, is that correct?

10         MR. FUCHS:  Correct, Your Honor.

11         MS. NEWBERGER:  That is correct.

12         THE COURT:  So if you all, Mr. Fuchs, at the conclusion

13    of today's hearing, if you'll come and get those files.  And then

14    the record will reflect that the government will keep those files

15    in a secured location.  And at the conclusion of this case, if

16    there is a conviction after trial or if there were to be a guilty

17    plea, if and only if there's a conviction in the case, then those

18    files will be made a part of the record so that Mr. Lucas on

19    appeal would have access to those, not to review them, but it

20    would be part of the record for the United States Court of

21    Appeals for the Fourth Circuit to be able to conduct its own

22    review now with respect to my decision as to any Giglio material.

23         Is that satisfactory to you, Ms. Newberger?

24         MS. NEWBERGER:  Your Honor, one issue that I wanted to

25    mention, and I actually didn't want to dwell on it today, I was

1    thinking that I would address it in writing later, but I think

2    that I should bring it up now before the items are returned to

3    Mr. Fuchs, is that in your letter you referred to two incidents,

4    cases in which there were issues with reports.  And what we would

5    ask is that we at least have access to the case numbers that

6    those cases involve so that we could see what the nature of the

7    finding was.

8            Also, Your Honor, given that there were sustained

9    complaints regarding veracity in report writing, we were curious

10   of the 25 complaints, how many of those were allegations that

11   involved report writing.

12           THE COURT:  All right.  Well, what we can do, Ms.

13   Newberger, is you can send me a short memo on this.  And I'll

14   give the government an opportunity to respond.  I'll be certainly

15   willing to respond to that inquiry.  What is probably, you

16   recognize, my normal pattern is whereas I do take the cautionary

17   step of requiring the government in any such situations to give

18   those files to me for my personal review in terms of any

19   potential Giglio material, not out of any criticism of the

20   government, it's just I think it's a much safer procedure that

21   the Court reviews those materials.  And I do so personally myself

22   in all cases as to any potential Giglio material.

23           The files themselves are never turned over because

24   that's contrary to the whole purpose of the Internal Affairs

25   Division of the, of any local police department.  But I will

1     certainly consider a request for further explanation of the

2     content or the matter of it, as well as that there's a case

3     number that's a matter of public record.  We'll just have to wait

4     and see on that.

5               MS. NEWBERGER:  Thank you.

6               THE COURT:  With that, we can address that later.  Yes,

7     Mr. Fuchs.

8               MR. FUCHS:  Your Honor, if I could ask you a brief

9     question.  Is the Court's intent to allow questioning on the fact

10    of those findings at this hearing?

11              THE COURT:  There's certainly, to the extent that

12    counsel for the defendant want to in some way challenge Officer

13    Laronde with respect to any credibility issues, I will certainly

14    allow some inquiry on it.  But we're not going to go too deep

15    into it, not into the specifics.  But the reason I've made it

16    available is so defense counsel has an opportunity to cross

17    examine Officer Laronde on that at any time that he testifies, be

18    it at a suppression hearing or if it's before, before a jury.

19              But not in any, not in any great depth, but to the

20    depth that I've summarized it.  Ms. Newberger is certainly free,

21    or Mr. Hurson is certainly free to cross examine him on it and

22    challenge credibility.

23              MR. FUCHS:  Thank you.

24              THE COURT:  So with that --

25              MS. NEWBERGER:  Your Honor, just as a matter as to this

1    hearing, Your Honor's familiar with the files.  You've already

2    looked at them.  So I do not plan to dig into that today.

3            THE COURT:  That's fine.  I'm aware of it.  You don't

4    need to belabor it.  I'm not saying you'd be belaboring it.  But

5    I'm aware of it because I've reviewed the files.  So I'm

6    certainly aware of any issues that have arisen in that regard.

7    We'll analyze the testimony accordingly.

8            So with that, I think that we are ready, I think that

9    we are ready to proceed.

10           MR. FUCHS:  Your Honor, with that, then, the government

11   would call Officer Patrick Huter.

12           THE COURT:  Thank you, Mr. Fuchs.

13           THE CLERK:  Please remain standing and raise your right

14   hand.

15        OFFICER PATRICK HUTER, GOVERNMENT'S WITNESS, SWORN

16           THE WITNESS:  I do.

17           THE CLERK:  Thank you.  You may be seated.  Please

18   speak directly into the microphone.  You can pull it down in

19   front of you.  Would you please state your name and spell your

20   name for the record?

21           THE WITNESS:  Officer Patrick Huter.

22           THE CLERK:  Spell your name, please.

23           THE WITNESS:  Huter, H-U-T-E-R.  First name Patrick.

24   P-A-T-R-I-C-K.

25           THE CLERK:  Thank you.

Case 1:09-cr-00560-RDB   Document 41   Filed 05/12/10   Page 9 of 93

1           MR. FUCHS:  Permission to proceed, Your Honor?

2           THE COURT:  Yes, you certainly may.

3           DIRECT EXAMINATION

4    BY MR. FUCHS:

5    Q    Officer Huter, who do you work for currently?

6    A    Baltimore City Police.

7    Q    What's your current assignment?

8    A    Southwest District Operations.

9    Q    And how long have you been a police officer?

10   A    Five years.

11   Q    Were you working on July 7th of 2009?

12   A    Yes.

13   Q    What shift were you working that day?

14   A    I was working 6 to 2 a.m.

15   Q    Were you in uniform?

16   A    No.  I was in plain clothes.

17   Q    Were you in a marked car?

18   A    No.  Unmarked vehicle.

19   Q    Who else was in the car with you?

20   A    Officer Laronde.

21   Q    And what area of the city were you patrolling that day?

22   A    The 35 Post, around 2700 block of Wilkens Avenue.

23   Q    Officer Huter, I'm going to show you what's been previously

24   marked as Government's Exhibit Number One.  Should appear on the

25   screen next to you.  Do you recognize that?

1   A    Yes.

2   Q    What is it?

3   A    It's a picture of the 2700 block of Wilkens.

4   Q    Does it appear to be a fair and accurate representation of

5   that area?

6   A    Yes.

7   Q    And if you would, you said you were patrolling the area that

8   day, is that correct?

9   A    Yes.

10  Q    What kind of neighborhood is that?

11  A    It's a very high crime area, open air drug market.

12  Q    While you were patrolling that area that day, did you

13  encounter anyone?

14  A    Yes.

15  Q    Okay.  Who did you encounter?

16  A    The defendant, Lewis Lucas, sitting to the right of counsel,

17  wearing the gray shirt.

18  Q    Your Honor, for the record, Officer Huter has identified the

19  defendant, Lewis Lucas.

20       THE COURT:  For the record, he's sitting to the left of

21  counsel at trial table, to the right of --

22       THE WITNESS:  My right.

23       THE COURT:  -- to the right of the witness.

24  BY MR. FUCHS:

25  Q    And Officer Huter, what time did you encounter Mr. Lucas?

1    A    Approximately 2 a.m.

2    Q    And if you would, and using the map, please, could you

3    describe the events leading up to that encounter?

4    A    We started off coming down the 600 block of Wilkens, or

5    Brunswick Street, here.  Coming down.  We're doing regular

6    patrol.  Made a right turn heading west on the 2700 block of

7    Wilkens, which is right here.  There's a median strip in the

8    middle.

9         As we were going down there, we saw the defendant.  And

10   we were supposed to be in the area looking for a shooting suspect

11   who matched the description of Mr. Lucas.

12   Q    And so what did you do at that time?

13   A    At that time, we made a U-turn, because there's a median in

14   the middle, and drove up to where we saw him.

15   Q    Now, who first saw Mr. Lucas?

16   A    Officer Laronde.

17   Q    And who made the determination that he matched the

18   description of the person?

19   A    Officer Laronde.

20   Q    So you said you pulled up, started heading eastbound, it

21   looks like, on Wilkens Avenue, is that correct?

22   A    Yes.

23   Q    Okay.  And if you could, just point on the map where exactly

24   you stopped.

25   A    Right here (indicating).

1   Q    Okay.  Now, is that the exact spot where you stopped or is

2   that an approximation?

3   A    That's approximate.

4   Q    And where was Mr. Lucas at this time?

5   A    Approximately in this area right here.

6   Q    Okay.  And what did you see him doing?

7   A    He was approaching a dwelling in that area.

8   Q    Okay.  And what did you do?

9   A    At that time, I exited the vehicle and asked him if I could

10  speak to him.

11  Q    Okay.  When you exited the vehicle, was he still on the

12  porch?

13  A    Yes.

14  Q    At that point, how far away were you from Mr. Lucas,

15  approximately?

16  A    Approximately ten feet.

17  Q    And when you got out of the car, were you identifiable as a

18  police officer in some way?

19  A    Yes.  I was, I had a vest.  I had my badge clearly

20  displayed, and I said "police."

21  Q    So you told Mr. Lucas you were a police officer?

22  A    Yes.

23  Q    And you asked if you could speak to him, is that correct?

24  A    Yes.

25  Q    Did you have your weapon out at this point?

1    A    No.

2    Q    Okay.  And what did Mr. Lucas do when you said that?

3    A    At that time, he just kept saying, Who, me, who, me?  And he

4    started coming towards me but very slowly and as if he did not

5    want to interact with me.

6    Q    Okay.  Did you put your hands on Mr. Lucas at any point?

7    A    No.

8    Q    Okay.  Did you draw your weapon at any point?

9    A    No.

10   Q    What happened next?

11   A    As the time he started coming down off the stairs from the

12   porch, he kept grabbing his waistband area.

13   Q    Did you see a gun or a firearm of any kind?

14   A    No.

15   Q    What happened after you saw him grab his waistband area?

16   A    I identified that as an armed, characteristic to an armed

17   person.  He kept coming down.  I said, Come here.  He kept saying

18   Who, me, at which time I started to approach him and he started

19   to back away from me.

20   Q    When he backed away, which direction was he heading in, if

21   you could show on that map?

22   A    This way (indicating).

23   Q    Okay.  And that's east on Wilkens, is that correct?

24   A    Yes, sir.

25   Q    And what happened next?

1    A    At that time, as I was approaching, he turned around and

2    started to flee from me.

3    Q    Now, prior to him starting to flee from you, at any point

4    did you put your hands on him?

5    A    No.

6    Q    At any point did your weapon come out?

7    A    No.

8    Q    Okay.  You said he started to flee, is that correct?

9    A    Yes.

10   Q    And that was on foot, is that correct?

11   A    Yes, sir.

12   Q    And where did he go?  If you can show on the map.

13   A    At that time he started heading eastbound on the 2700 block

14   of Wilkens, at which point he cut through a lot, it's a grass lot

15   with a couple trailers on it.

16   Q    And at that point, did you give pursuit?

17   A    Yes.

18   Q    Okay.  How far behind him were you?

19   A    Approximately ten feet.

20   Q    Okay.  Did you ever lose sight of him up to the point which

21   you've described?

22   A    No.

23   Q    If you would, describe the illumination in the area.

24   A    There's street lights.  It's a well lit area.

25   Q    Did you have a flashlight?

1    A    Yes.

2    Q    Okay.  And was that in your hand?

3    A    Yes.

4    Q    Was it on?

5    A    Yes.

6    Q    Okay.  And you described that he went through this grass

7    area on the map?

8    A    Yes, right here, through the grass area.

9    Q    Okay.  And was anyone else chasing Mr. Lucas?

10   A    No.  Well, Officer Laronde was in the car.

11   Q    Okay.  Was anyone else chasing him on foot?

12   A    No.

13   Q    Okay.  And could you see Officer Laronde as you chased Mr.

14   Lucas down the street?

15   A    I could.  He was in the car parallel to us.

16   Q    So he was traveling eastbound on Wilkens in the car?

17   A    Yes.

18   Q    And if you would, from the point that you've drawn here,

19   where did he go after that?

20   A    After that, he went southbound on the 900 block of

21   Brunswick.

22   Q    Did you notice anything about the way he was running?

23   A    Yeah.  He kept grabbing with his right hand towards his

24   waistband area.

25   Q    Okay.  And what did that mean to you?

1    A    Characteristics of an armed person, somebody trying to

2    secure their weapon while running.

3    Q    And as he started running south on Brunswick, did you

4    continue to follow him?

5    A    Yes.

6    Q    And what was the distance between you and Mr. Lucas at this

7    point?

8    A    About ten feet.

9    Q    Again, did you lose sight of him at any time?

10   A    No.

11   Q    Are there street lights on Brunswick?

12   A    Yes.

13   Q    And was your flashlight still in your hand?

14   A    Yes.

15   Q    So could you see Mr. Lucas clearly ahead of you?

16   A    Yes.

17   Q    If you would, for the Court, show Mr. Lucas's route as he

18   went down Brunswick.

19   A    Continued down Brunswick, at which time there's, the row

20   homes end.  There's a fence and there's a fence between the,

21   there's a fence and a dwelling, and there's a small, probably

22   three foot, path going down in between, back to an alley.

23   Q    Okay.  And as you've indicated on the map, is that heading

24   west parallel to Wilkens?

25   A    Yes.

Case 1:09-cr-00560-RDB   Document 41   Filed 05/12/10   Page 17 of 93

1    Q    I'm going to show you what's been marked as Government's

2    Exhibit Number Two.  Is there some way, you can hit one of the

3    corners of the map?  There you go.

4              I'm showing you what's been marked as Government's

5    Exhibit Number Two.  Do you recognize that?

6    A    Yes.

7    Q    And what is that?

8    A    That's the alley that comes off of Brunswick.

9    Q    Okay.  Where's the cameraman standing?  What is he facing?

10   A    He's facing Brunswick from the alley.

11   Q    So is it fair to say that as Mr. Lucas ran down this alley,

12   he'd be running towards the cameraman?

13   A    Yes.

14   Q    If you could approximate, how long do you think the alleyway

15   is from Brunswick to where it terminates?

16   A    Thirty feet.

17   Q    Okay.  And is it a dead end?

18   A    Yes.

19   Q    Does it go anywhere else?

20   A    Yes.  It cuts to the right.  It dead ends.  It does dead

21   end, but it cuts to the right.

22   Q    Okay.  And is the alleyway itself illuminated?

23   A    No.

24   Q    Are there street lights immediately adjacent to it?

25   A    Yes.  There's a parking lot area, a Ryder truck rental car

1    area that's illuminated by street lights.

2    Q    So could you see inside the alleyway?

3    A    Yes.

4    Q    Did you also have your flashlight, did you still have your

5    flashlight with you?

6    A    Yes.

7    Q    And your flashlight was on?

8    A    Yes.

9    Q    Okay.  So you could see Mr. Lucas clearly?

10   A    Yes.

11   Q    And at this point how far behind Mr. Lucas were you?

12   A    At this point, as he reached the end, he slowed down, so I

13   was probably about five feet away from him.

14   Q    Okay.  And did you see him do anything?

15   A    Yeah.  At that time he was running.  As he made the turn,

16   the hard right, he reached with his right hand and pulled a black

17   object, which I recognized to be a gun, and threw it to the

18   ground.

19   Q    Show you again Government's Exhibit Number One.  If you

20   could, could you indicate where the alley turns?

21   A    Right here (indicating).

22   Q    Okay.  And is that the area, the general area where you saw

23   him discard that handgun?

24   A    Yes.

25   Q    And where did he -- sorry.  Backing up.  What did the object

 1   look like, what you described?

 2   A    It was a black, fairly solid object that I believed to be a

 3   handgun.

 4   Q    Okay.  Did you hear it hit the ground?

 5   A    Yes.

 6   Q    Did you see approximately where it landed?

 7   A    Yes.

 8   Q    Okay.  And where was that?

 9   A    I mean, the gun, in the same general area.

10   Q    And after he dropped the handgun, where did he go, if you

11   can show on the map?

12   A    At that time he went approximately another ten feet, where I

13   tackled him and we went to the ground.

14   Q    Okay.  Did he submit to your authority at that point?

15   A    No.

16   Q    What happened?

17   A    At that time, we wrestled for a couple minutes until I was

18   able to subdue him and put him in handcuffs.

19   Q    Okay.  And at some point did Officer Laronde arrive --

20   A    Yes.

21   Q    -- at your location?

22   A    Yes.

23   Q    Okay.  How long after you subdued Mr. Lucas did Officer

24   Laronde arrive?

25   A    A couple minutes.

1    Q    Is that an exact calculation or is that just an

2    approximation?

3    A    No, just an approximation.

4    Q    Okay.  When Officer Laronde arrived, did you speak to him?

5    A    Yes.

6    Q    What did you tell him?

7    A    At that time, after he asked me if I was okay and stuff like

8    that, I told him I saw him throw what I believed to be a handgun

9    over here, and I illuminated the area with my flashlight.  He

10   walked over there and found the handgun.

11   Q    I'm going to show you what's been marked previously as

12   Government's Exhibit Number Three.  Do you recognize that?

13   A    Yes, sir.

14   Q    And what is that?

15   A    That's the area in which the handgun was found, and the

16   corner of the alley.

17   Q    Okay.  Does the picture here look exactly as the alleyway

18   did at the time of the arrest?

19   A    No.

20   Q    Okay.  What's different?

21   A    There was a lot more shrubbery.  Somebody went through here

22   and cleared this out.  But it was very full of trash, full of

23   trees, overgrown, weeds, stuff like that.

24   Q    And if you could, could you show on the picture

25   approximately where you saw Officer Laronde recover that weapon.

1    A    Approximately in that area (indicating).

2    Q    Okay.  And again, is that --

3    A    That's an approximation.

4    Q    Your Honor, permission to approach the witness?

5              THE COURT:  Certainly.

6    Q    I'm going to show you what's been marked as Government's

7    Exhibit Number Four.  Do you recognize that?

8    A    Yes, I do.

9    Q    And what is it?

10   A    It's the black handgun that was found in the area that I've

11   indicated.

12   Q    And how do you know it's the same gun?

13   A    I recognize it from that night, and also the CC number.

14   Q    And sitting here today, is that the gun you saw Officer

15   Laronde recover?

16   A    Yes.

17   Q    And when Officer Laronde recovered that weapon on July 7th,

18   did it look like the gun that you had seen Mr. Lucas discard?

19   A    Yes.  I remember it after seeing it was a black handgun.

20   Q    At some point, was Mr. Lucas transported from the scene?

21   A    Yes.

22   Q    Prior to that, did he give you any statements?

23   A    No.

24   Q    No further questions, Your Honor.

25             THE COURT:  Thank you very much, Mr. Fuchs.  Ms.

Case 1:09-cr-00560-RDB   Document 41   Filed 05/12/10   Page 22 of 93

1    Newberger.

2             CROSS EXAMINATION

3    BY MS. NEWBERGER:

4    Q    Thank you, Your Honor.  Good afternoon.  How long have you

5    been assigned to the Southwestern District?

6    A    I would say approximately four years.

7    Q    And how long have you been a plain clothes officer?

8    A    Two years.

9    Q    And how long have -- is Officer Laronde your partner?

10   A    Yes.

11   Q    How long have you been partners?

12   A    Two years.

13   Q    Now, when did you first learn -- let me take a step back.

14   You mentioned that you were looking for someone who was wanted in

15   a shooting?

16   A    Correct.

17   Q    Do you now know that person's name to be Laurence Jones?

18   A    That's what I found out after this.

19   Q    Okay.  How did you first learn that this person was wanted

20   for a shooting?

21   A    It's on a lookout sheet because they hand out lookout sheets

22   for suspects wanted in incidences.

23   Q    Okay.  Where do they hand them out?

24   A    At the station.

25   Q    Okay.  Is this the lookout sheet that you saw?

Case 1:09-cr-00560-RDB  Document 41  Filed 05/12/10  Page 23 of 93

1   A    Yes.

2   Q    Okay.  And is this the exact sheet that was passed around?

3   A    I don't know if that's the exact sheet.

4   Q    You don't recall?

5   A    This one that you're showing me is the exact sheet?  No, I

6   don't recall.

7   Q    Okay.  But this is basically what it would look like.  It

8   would have a photograph and some identifying information?

9   A    Correct.

10  Q    Can you tell me, this says, Do not try up WATF has the case.

11  What does that mean?

12  A    A try-up is a house try-up, not a person try-up.  Try up

13  means don't go to their house and try to find them.

14  Q    Okay.  So it means if you see them out on the street, we're

15  looking for him, but don't go to his house?

16  A    Yes.

17         THE COURT:  Ms. Newberger, is that marked as

18  Defendant's Exhibit One?

19         MS. NEWBERGER:  It is, Your Honor.  Thank you.

20         THE COURT:  It will be deemed admitted.  Thank you.

21  For the record, Defendant's Exhibit One is a photograph of

22  Laurence Jones.

23         MS. NEWBERGER:  Yes.  Thank you, Your Honor.  And would

24  you like a copy?

25         THE COURT:  No.  I don't need one.  You can give me one

1    if you want, but I can see it here on the screen.  That's fine.

2    Just make sure it's marked part of the file, for the record.

3    Photo of Laurence Jones.

4    BY MS. NEWBERGER:

5    Q    And is the way you knew what he looked like based on the

6    sheet that was passed around?

7    A    Based on the photograph.

8    Q    Photograph?  Okay.  And what was your understanding of what

9    he had done?

10   A    It says wanted for a shooting.

11   Q    Okay.  So it would have also been on the sheet?

12   A    It says wanted for a shooting.

13   Q    Okay.  And when a sheet like this comes around, you know not

14   to go to their house to arrest them.  But what are you supposed

15   to do if you come into contact with the individual?

16   A    We're supposed to take them to talk to detectives.

17   Q    Okay.  Arrest them?

18   A    No.  Detain them.

19   Q    Detain them.

20   A    For questioning.

21   Q    For questioning.  But detain means you can cuff them?  If

22   they don't want to go, you can force them to come with you?

23   A    No.  At that time, we stop them, we ask them, identify them

24   first to make sure that it is the correct person.  And then we

25   contact our detectives that are in the Detective Unit, see what

Case 1:09-cr-00560-RDB   Document 41   Filed 05/12/10   Page 25 of 93

1   they want to do with them.

2   Q    Okay.  So say things had gone differently the night in

3   question and the person you stopped was, in fact, Laurence Jones.

4   You would have said, Hey, let me talk to you.  And if you had him

5   still for a while, you would call this Detective Dease and say,

6   What do you want us to do with him?

7   A    I don't know, I mean, you're asking me of a situation that

8   didn't happen.  Depending on the situation at hand, it could have

9   been handled different ways.

10  Q    Okay.  You came on duty at 6 p.m.?

11  A    Yes, ma'am.

12  Q    So when this incident occurred, you were about to go off

13  duty?

14  A    Yes, ma'am.

15  Q    All right.  And you were plain clothed?

16  A    Yes, ma'am.

17  Q    Can you describe what you were wearing that night?

18  A    General, I had a vest on, handcuffs, a gun, badge, extra

19  magazine.

20  Q    Okay.  Where would -- would the vest be underneath your

21  clothing or on top of it?

22  A    I do not recall which way I had it at the time.

23  Q    Okay.  And your gun, your cuffs, where are they kept?

24  A    My gun is on my hips.  My handcuffs are in the back of my

25  waistband.

Case 1:09-cr-00560-RDB Document 41 Filed 05/12/10 Page 26 of 93

1    Q    So even though you're plain clothed, are you still

2    wearing --

3    A    It's fairly --

4    Q    -- a utility belt?

5    A    Not a utility belt but it's fairly obvious that I'm a police

6    officer.

7    Q    Okay.  But it's not in your pocket?

8    A    The gun?

9    Q    You have a holster for it?

10   A    Oh, yes.  It's clearly displayed on the outside.  I'm not

11   undercover.  I'm just plain clothes.

12   Q    Okay.  Thank you.  Now, do you have a flashlight on your

13   holster, on your belt as well?

14   A    I carry it in my hand.

15   Q    You carry it in your hand.  And the car.  It was an unmarked

16   car?

17   A    Yes.

18   Q    Do you remember what the make and model was?

19   A    No, I don't remember which car we had.

20   Q    Do you remember if the windows were tinted or not?

21   A    None of our windows are tinted.

22   Q    None of the windows are tinted.  Okay.  And it was Officer

23   Laronde who was driving that night?

24   A    Yes, ma'am.

25   Q    Is Officer Laronde usually the one who drives?

Case 1:09-cr-00560-RDB Document 41 Filed 05/12/10 Page 27 of 93

1    A    We switch on and off.

2    Q    Okay.  Now, I'm lower tech than Mr. Fuchs so I'm going to

3    ask that, Your Honor, may I approach?

4              THE COURT:  Certainly.

5    Q    I'm going to ask you to draw so it's a little bit more clear

6    because it disappeared when it's on that screen.

7              I have two photographs here.  Is this --

8              THE COURT:  I think Defendant's Exhibit Two, is that

9    right, Ms. Newberger?

10             MS. NEWBERGER:  This is defendant's Exhibit Two, Your

11   Honor.  And it's actually the same thing as Government's Exhibit

12   One.  It's just enlarged.

13             THE COURT:  Thank you.

14   BY MS. NEWBERGER:

15   Q    Could you step around and could you draw for me where it was

16   that, where you and Officer Laronde were coming from?

17   A    Right here (indicating.)

18   Q    Okay.  Can you just draw an arrow so that I -- okay.

19   A    (Witness complies.)

20   Q    And can you further your route to where it was you first

21   noticed or Officer Laronde first noticed the defendant?

22   A    (Witness complies.)

23   Q    Okay.  And Officer Laronde is the one who notices the

24   defendant?

25   A    Correct.

1    Q    And so where he does he do the U-turn?

2    A    As you can see, the median's over here.

3    Q    Okay.  So can you just --

4    A    (Witness complies.)

5    Q    Can you mark with and draw, and mark with an A the point

6    where you got out of the vehicle?  Where the vehicle stopped and

7    you got out.

8    A    Vehicle stopped.

9    Q    Wonderful.  Okay.  So you get out of the vehicle at that

10   point?

11   A    Correct.

12   Q    And then could you draw on this the route that you followed

13   Mr. Lucas?

14   A    All the way to the end?

15   Q    Yeah.

16   A    Okay.

17   Q    Can you label with a B the point where you think you saw him

18   throw the firearm?

19   A    (Witness complies.)

20   Q    And can you label as C where you tackled him?

21   A    (Witness complies.)

22   Q    And then after he is cuffed and under control, where is

23   Officer Laronde's car?  Where do you bring him back to?

24   A    Where is he brought back to?

25   Q    Um-hum.

1    A    This area (indicating).

2    Q    Can you just put a D there?

3    A    (Witness complies.)

4    Q    Wonderful.  Thank you.  So now, when you, let's start back

5    from the very beginning when you turn around that corner.  How

6    fast do you remember was Officer Laronde driving when you guys

7    first noticed the defendant?

8    A    I don't recall the exact speed limit --

9    Q    Okay.

10   A    -- that he was traveling.

11   Q    And it was Officer Laronde who noticed him?

12   A    Correct.

13   Q    Were you able to visually see, yeah, that does look like the

14   guy we're looking for?

15   A    Correct.

16   Q    All right.  And were you expressly looking for him that

17   night?

18   A    We were, I mean, we were told to be on the lookout for this

19   gentleman pretty --

20   Q    So it was high priority?

21   A    Right.  Correct.

22   Q    Okay.  And when you noticed him, was he on the porch?

23   A    Correct.

24   Q    Okay.  And do you recall, was the house -- I'm going to come

25   back over.  Is it this house right here on the end, next to the

1   alley?

2   A    I do not recall exactly which house it is.  It's that

3   general area.  The last block of row homes.

4   Q    Okay.  On this last, it was one of these four houses?

5   A    Yes, ma'am.

6   Q    Okay.  And he's on the porch?

7   A    Yes, ma'am.

8   Q    Now, when Officer Laronde does the U-turn, did you guys have

9   a plan for how you were going to address this individual?

10  A    No, we did not.

11  Q    Okay.  So you didn't discuss it beforehand, whether you were

12  going to try to arrest him or --

13  A    Not really beforehand.  I mean, that's 30 yards.

14  Q    Okay.  So when you get out of the car, do you leave the car

15  door open?  Is it closed?

16  A    I do not recall the condition of the car door.

17  Q    Okay.  Do you recall whether Officer Laronde was able to

18  hear your conversation with the defendant?

19  A    I do not recall.  I remember it was warm outside so the

20  windows were probably down.  But I don't know for certain.

21  Q    Is that normal practice on patrol, to keep the windows open

22  so you can hear what's going on around you?

23  A    I'm not sure what you mean by "normal practice."  It's not

24  in our general orders to have windows down or anything like that.

25  Q    Okay.  Okay.  Now, when you and Officer Laronde believe that

1   you had the shooting suspect, did you call for backup?

2   A    No, we didn't.  We want to make sure, we're not going to

3   call for backup for somebody that's not a shooting suspect.  We

4   want to identify him first.

5   Q    Okay.  So when you get out of the car, you ask him to come

6   and speak with you?

7   A    I asked him if I could speak with him.

8   Q    Okay.  And you identify yourself as being a police officer?

9   A    Yes.  Badge clearly displayed, I said "police."

10  Q    Where do you wear your badge when you're in plain clothes?

11  A    On my hip.

12  Q    So it would be down by your waist?

13  A    Right next to the gun.

14  Q    Okay.  So it's on a belt?

15  A    Yes.

16  Q    All right.  So at that point, do you still believe that the

17  defendant is the shooting suspect?

18  A    Yes.

19  Q    Okay.  And so he runs and you give chase?

20  A    Correct.

21  Q    Now, when you refer to the dip area or the waistband area

22  that he is grabbing, where specifically are you referring to?

23  A    Where your pants meet your waist.  Your front waistband

24  area.

25  Q    Okay.  To the center?  To the side?

1    A    No, the center.

2    Q    Okay.  And you're chasing him on foot?

3    A    Correct.

4    Q    And you have a flashlight out?

5    A    Correct.

6    Q    At what point did you turn the flashlight on?

7    A    My flashlight was on the entire time.

8    Q    From the time you got out of the car?

9    A    Correct.

10   Q    When you got out of the car -- were you shining it at him?

11   A    No, I was shining it in the general area that I need to

12   illuminate at the time.  I don't exactly remember which way it

13   was pointed.

14   Q    Okay.  But so when you get out of the car and say, Hey, can

15   I talk with you, you have a flashlight out and it's illuminating?

16   A    It's on and -- yes.

17   Q    And you run with the flashlight?

18   A    Correct.

19   Q    And how are you holding the flashlight as you run?

20   A    In my left hand.

21   Q    Are you left handed?

22   A    No, but I want to keep my other hand free.  I have a gun.

23   Q    Okay.  At any point did you reach for your gun?

24   A    No.

25   Q    Did you have your hand on your --

1    A    (Nods negatively.)

2    Q    No?  And when, when you started chasing the defendant, were

3    you able to stay in communication with Officer Laronde?

4    A    No.

5    Q    You had no way?

6    A    He's in a vehicle, I was on foot.

7    Q    Okay.  You didn't have a walkie-talkie out or a cell phone

8    or any way of communicating?

9    A    No.  I had a radio but I wasn't using it at the time.

10   Q    Okay.  Where was the radio?

11   A    Probably on my belt loop.

12   Q    That sits on your belt as well?

13   A    Correct.

14   Q    Do you recall, could you hear, was officer -- I don't know

15   how these work.

16   A    I don't recall conversation going on on the radio when I was

17   chasing him.

18   Q    Okay.  Would it have been possible for Officer Laronde to

19   call out on the radio to you while you were, or do you have to do

20   something, be holding the radio or pressing something for you to

21   get it?

22   A    It's a walkie-talkie.  If you press the button, it talks,

23   it's going to come through on my end.

24   Q    Okay.  So you hear no matter --

25   A    No.  I mean, I don't know.  Do I have to type in a code?

Case 1:09 cr 00560 RDB   Document 41   Filed 05/12/10   Page 34 of 93

1    No.  I mean, it's just a walkie-talkie.

2    Q    Okay.  Now, you said that the, there are lights in the Ryder

3    yard?

4    A    Pardon?  You said?

5    Q    There were street lights in the Ryder yard?

6    A    Correct.

7    Q    I just want to, for the record.  Is this the Ryder lot that

8    you're talking about?

9    A    Correct.

10   Q    Okay.  And so does that look like a street lamp?

11   A    To me, does that look like -- it looks like a line.

12   Q    A line?  Okay.

13   A    I mean, I'm not going to sit here and point out where

14   exactly the street lights are.

15   Q    Do you remember where the lights are in this?

16   A    Exactly?  No.

17   Q    Okay.  But they're facing the lot?

18   A    Correct.  They're off the ground so they illuminate

19   everything around it, not a certain point.

20   Q    Okay.  Your flashlight was giving off about how much light?

21   A    Are you asking the luminous of the flashlight?  I don't know

22   exact.  I mean, I don't know how powerful the flashlight is, the

23   flashlight.

24   Q    But you could see clearly?

25   A    Yes.

1   Q    And at no time you pulled your firearm out?

2   A    At no time did my firearm come out of my holster at all.

3   Q    Now, what was, what did Mr. Lucas do physically that made

4   you believe that he had thrown a firearm?

5   A    I could see his arm coming across his body and a black

6   object, which I believed to be a handgun, coming out of his hand

7   and land on the ground.

8   Q    Okay.  So it was his, his right arm and right hand?

9   A    Right hand.  Yes.

10  Q    And you saw it cross his body?

11  A    I could see it go across his body.

12  Q    Okay.  So if he's running, he throws it to his left?

13  A    Correct.

14  Q    And at this point, how far away do you think you were?

15  A    At the point of him throwing the gun?

16  Q    Yes.

17  A    Approximately five feet.

18  Q    Five feet.  So you had pretty much, you were gaining on him

19  at that point?

20  A    Well, he had to slow down or he's going to run into a fence,

21  to make the turn.  So he slowed down, I gained.

22  Q    Okay.  But you didn't run into him?

23  A    No.  I didn't run into him.

24  Q    So did you have to sort of slow down as well to make that

25  turn?

1    A    Yeah, of course.

2    Q    And when you saw this happen, you saw where the gun landed?

3    A    Correct.

4    Q    So did you take your eyes off of Mr. Lucas to know where it

5    had landed?

6    A    I saw the approximate area.  I didn't see the exact area.  I

7    looked over and noticed that it was in the corner area.  My main

8    concern was him.

9    Q    So you said that at this point, Government Exhibit Three, at

10   the time the incident occurred you said that there was a lot more

11   overgrowth?

12   A    Correct.

13   Q    And debris?

14   A    Correct.  Overgrowth, debris, trash, glass.  It's a dirty

15   alley.

16   Q    Yeah, it's a pretty dirty alley.  And at no time did you

17   lose your balance?

18   A    No.

19   Q    Did Mr. Lucas trip at all?  Is that how you might have been

20   able to catch up with him?

21   A    No.

22   Q    You just were able to tackle him?

23   A    Correct.

24   Q    Can you describe for me how, how did you first make contact?

25   A    How did I first make -- I lunged at him and wrapped him with

1   my arms, trying to take him down.

2   Q    So you just sort of jumped for him?

3   A    Correct.

4   Q    And you grabbed his?

5   A    I don't remember exactly which area I grabbed.  I grabbed

6   the correct area to make him fall.  Whatever area that was.

7   Q    So you got him down on the ground?

8   A    Correct.

9   Q    And you said it felt like it took a couple of minutes to get

10  him under control?

11  A    I said approximately a couple minutes.

12  Q    Approximately a couple minutes.  Did you, did you pull your

13  gun at any point?

14  A    Again, my gun never came out of the holster the entire time.

15  Q    Okay.  Did you use the flashlight as a weapon?

16  A    No.

17  Q    Where was the flashlight at this point?

18  A    Probably laying right next to me, because I was able to

19  reach it.

20  Q    Okay.  Now, was Officer Laronde, could you see him at this

21  point?

22  A    I was not looking for him.

23  Q    Okay.

24  A    I was more, again, worried about the suspect I was fighting

25  with than looking where he was.

Case 1:09-cr-00560-RDB   Document 41   Filed 05/12/10   Page 38 of 93

1    Q    Okay.  And so once you got, once you got Mr. Lucas under

2    control, did you, did you radio for Officer Laronde?

3    A    At that time, Officer Laronde saw the alley that I went

4    down.  So by the time I was handcuffing him, he came back around

5    to the alley and --

6    Q    Okay.  So was he on foot in the alley or was he in the car

7    in the Ryder lot?

8    A    He came back around.

9    Q    Okay.

10   A    He was in the car in the Ryder lot, then came back around

11   once he noticed where he was.  Came back around and then came on

12   foot.

13   Q    Okay.  So you were conscious at some point that he was in

14   the squad car in the Ryder lot because that was the way that he

15   could get the vehicle closest to you?

16   A    Are you asking if I knew that he was in the Ryder lot?

17   Q    Yeah.

18   A    I don't recall if I knew if he was in the Ryder lot or not.

19   Again, I wasn't really concerned about what he was doing.

20   Q    Okay.  And so you cuffed the defendant on your own?

21   A    Correct.

22   Q    Did you have the cuffs on your person?

23   A    Yes.

24   Q    Okay.  And Officer Laronde met you back in this alleyway

25   that's depicted here?

1    A    Yes.

2    Q    Okay.  And the defendant was still detained in that area

3    when you told Officer Laronde that he had thrown a firearm?

4    A    Correct.  I was still -- yes.  He was still in handcuffs and

5    same spot that the incident took place.

6    Q    Was he seated?  Was he laying down?

7    A    No, he was laying on his, flat on his stomach.

8    Q    Okay.  And that's when you told Officer Laronde where you

9    thought you saw the gun fall?

10   A    That's when I picked up my flashlight and pointed in the

11   area and said, Hey, he threw, there's a handgun over there, he

12   threw it.

13   Q    Okay.  So Officer Laronde found the gun with only the

14   illumination of your flashlight?

15   A    And the street lights from the Ryder truck.

16   Q    But Officer Laronde didn't have a flashlight of his own?

17   A    No, he had a flashlight.

18   Q    He had a flashlight, too?

19   A    Yes.

20   Q    So there are two flashlights?

21   A    Yeah.  I had one, he had one, too.

22   Q    Now, at what point did you call Dispatch?

23   A    After he recovered the handgun, then we told -- I didn't

24   contact them.  I don't know if prior to what he was doing in the

25   Ryder truck parking lot, if he was communicating with Dispatch.

1    Q    Did uniformed officers respond at some point?

2    A    Yes.

3    Q    How many cars?

4    A    I don't know how many cars.

5    Q    Do you remember approximately how many officers?

6    A    No.  I'm not even going to take a guess at that.  I don't

7    know exactly how many were there.

8    Q    Do you remember if Travon Smith (phonetic) was there?

9    A    I do not recall from Travon Smith was there.

10   Q    Do you remember if there was a female officer who showed up?

11   A    I don't recall if there's --

12   Q    Okay.  You don't remember?

13   A    I don't recall who was there from Patrol.

14   Q    Okay.  And where did you first see the patrol officers?

15   A    As we came back out on to the 900 block of Brunswick.

16   Q    So they were just on Brunswick?

17   A    Yes.  That's where I saw them.

18   Q    Okay.  And did you take Mr. Lucas back in your and Officer

19   Laronde's car or did the uniformed officers take him to the

20   Southwestern District?

21   A    I don't recall his means of transportation.  I believe it

22   was a wagon.

23   Q    Okay.  Now, did either you or Officer Laronde take

24   photographs of where the, where the firearm was found?

25   A    At the time it was recovered?

1    Q    Yes.

2    A    No.

3    Q    Did you call for evidence technicians to come?

4    A    No.

5    Q    Did Officer Laronde pick up the gun with his bare hands?

6    A    I don't recall the means in which he picked it up.  I was

7    escorting Mr. Lucas.

8    Q    And do you recall approximately how long it took for Officer

9    Laronde to find the weapon?

10   A    I mean seconds.

11   Q    Okay.  And who wrote the report in this case?

12   A    I did.

13   Q    Do you usually write the report?

14   A    Usually, if it's my arrest, I do.  If it's somebody else's

15   arrest, they write their own reports.

16   Q    Your Honor, may I have one minute?

17              THE COURT:  Certainly.

18              (Pause in Proceedings.)

19   BY MS. NEWBERGER:

20   Q    Was there a 24 hour report or any other types of reports

21   written?

22   A    I do not recall if there was a 24 hour report written.

23   Q    Do you recall whether you took any handwritten notes?

24   A    No.

25   Q    And when was it that you realized that the defendant under

1    arrest was Lewis Lucas and not the shooting suspect?

2    A    When he gave us his name.

3    Q    Okay.  And how were you able to verify his identity?

4    A    Through our NCIC access.

5    Q    So through prints?

6    A    No, not through prints.  His name and you run it through our

7    database and it comes up with his arrest record and stuff like

8    that, and tells is a picture and stuff like that.

9    Q    Okay.  So you saw a picture and said, Oh, this is Lewis

10   Lucas?

11   A    (Nods affirmatively.)

12   Q    Okay.  And did you search him?

13   A    I didn't search him, no.

14   Q    Okay.  So at the time of his arrest, you didn't then pat him

15   down?

16   A    Oh, you meant search him --

17   Q    Incident to the arrest.

18   A    His person, not the --

19   Q    Yes.

20   A    Yeah.  Made sure he had nothing, no more guns, knives,

21   contraband on him.

22   Q    Okay.  So it wasn't until you got to the Southwestern

23   Precinct that you realized that he was Lewis Lucas?

24   A    No, it was there when he told me his name is Lewis Lucas.

25   Q    Okay.  So was it out on Brunswick?

1    A    Correct.

2    Q    Okay.  Thank you.  I have no further questions, Your Honor.

3         THE COURT:  Any redirect, Mr. Fuchs?

4         REDIRECT EXAMINATION

5    BY MR. FUCHS:

6    Q    Your Honor, just very briefly.  Officer Huter, when you

7    indicated on the map there the location of where people were and

8    where certain things occurred, are you testifying to the exact

9    location or a general sense of your recollection?

10   A    No.  It's a general sense.  I could draw the A a lot bigger.

11   The A doesn't mean that's it.  The circled area, that's why I

12   circled it, because it's an approximation.

13        MR. FUCHS:  That's all the question.

14        THE COURT:  Thank you, Mr. Fuchs.  You may step down.

15   Officer Huter, you should not discuss your testimony with anyone

16   until this hearing is over.  So you should remain outside the

17   courtroom in the hallway in case you need to be called back to

18   the witness stand.

19        THE WITNESS:  Thank you, Your Honor.

20        THE COURT:  Thank you very much.  All right.  Next

21   witness, Mr. Fuchs.

22        MR. FUCHS:  Your Honor, the government calls Officer

23   Fabien Laronde.

24       OFFICER FABIEN LARONDE, GOVERNMENT'S WITNESS, SWORN

25        THE WITNESS:  Yes, I do.

1          THE CLERK:  Thank you.  You may be seated.  Would you

2    please speak directly into the microphone.  Please state your

3    name and spell your name for the record.

4          THE WITNESS:  Officer Fabien Laronde.  F-A-B-I-E-N.

5    Laronde.  L-A-R-O-N-D-E.

6          THE CLERK:  Thank you.

7          DIRECT EXAMINATION

8    BY MR. FUCHS:

9    Q    Permission to proceed, Your Honor?

10         THE COURT:  Yes, certainly.

11   Q    Officer Laronde, who do you currently work for?

12   A    Baltimore City Police Department.

13   Q    What's your current assignment?

14   A    I'm assigned to the Southwest District Operations.

15   Q    How long have you been a police officer?

16   A    A little over 8 years.

17   Q    Were you working July 7th, 2009?

18   A    Yes, I was.

19   Q    What shift were you working that day?

20   A    We were working night shift.

21   Q    And what area of the city were you patrolling?

22   A    It was, it's 835 Post, which is area of the Southwest

23   District.

24   Q    Okay.

25         THE COURT:  Mr. Fuchs, can you clarify something for

1   me.  Is the date of this incident July the 7th or July the 6th?

2          MR. FUCHS:  It's July 7th, Your Honor.  There was some

3   confusion because it was so late.

4          THE COURT:  The indictment charges on or about July

5   6th, correct?

6          MR. FUCHS:  I believe that's correct, Your Honor.  It's

7   actually, it's very early on the morning on July 7th.

8          THE COURT:  All right.  In the early morning hours of

9   July 7th.  Thank you very much.

10  BY MR. FUCHS:

11  Q    Officer Laronde, what kind of neighborhood is that area that

12  you were patrolling?

13  A    The area is a known open air drug market.  And we were

14  assigned to that area due to a spike in violent crime.

15  Q    Officer Laronde, I'm going to direct your attention to

16  what's been marked as Government's Exhibit Number One.  Can you

17  see that on the screen in front of you?

18  A    Yes.

19  Q    Do you recognize that?

20  A    Yes.

21  Q    What is it?

22  A    It's an aerial view of the Wilkens, 2700 block of Wilkens at

23  Brunswick Street.

24  Q    Okay.  Is that a fair and accurate representation of that

25  area?

1    A    Yes.

2    Q    And that is the area, the approximate area in which you were

3    patrolling that day, is that correct?

4    A    Yes, it was.

5    Q    Were you in uniform that night?

6    A    No.  We were in plain clothes and an unmarked vehicle.

7    Q    Okay.  And who else was in the car with you?

8    A    Officer Huter.

9    Q    And who was driving?

10   A    I was driving.

11   Q    Did there come a time when you encountered someone in the

12   2700 block of Wilkens?

13   A    Yes.

14   Q    Who did you encounter?

15   A    The defendant, Lewis Lucas, seated to the right of counsel.

16   Q    Your Honor --

17          THE COURT:  Again, for the record, reflect that the

18   witness has identified the defendant, Lewis Lucas.  But he's to

19   the right of the witness, but he's to the left of defense

20   counsel.

21   BY MR. FUCHS:

22   Q    Officer Laronde, could you describe for the Court, using the

23   map, the events leading up to your encounter with Mr. Lucas?

24   A    Yes.  We were coming off of Brunswick Street.  We were

25   actually traveling back to the station, which would be westbound.

1    At that time, I observed Mr. Lucas walking up to the door.

2    Q    Sir, I'm sorry.  The counter is not working?  If you press

3    the screen, it should leave a mark.

4    A    Okay.  I'm sorry.  Coming down Wilkens Avenue, at which time

5    I observed the defendant, he was standing on the porch.  The

6    defendant looked like a suspect we were looking for in reference

7    to a shooting that happened I think either the day before or a

8    couple days before on Brunswick Street, which is right here

9    (indicating).

10          I observed the defendant on the porch.  He was

11   approximately, I think, on one of these porches in this, in these

12   houses.  We continued down.  I made a U-turn around the, there's

13   a median.  We came up and I pulled approximately right there, in

14   front of the home where Mr. Lucas was on the steps.

15   Q    Okay.  Were you the first person to see Mr. Lucas?

16   A    Yes.

17   Q    Okay.  And when you pulled up to the curb, were you right

18   against the curb?

19   A    I don't recall if we were right on the curb or if there was,

20   you know, a car there and we were kind of in the middle of the

21   street.  I stopped in front of that home.

22   Q    Okay.  So you were directly opposite Mr. Lucas, is that

23   correct?

24   A    Yes.

25   Q    And do you remember approximately what time this was?

1    A    It was about 2:00 in the morning.

2    Q    And did you speak to Mr. Lucas?

3    A    No.

4    Q    Did you see if anyone spoke to Mr. Lucas?

5    A    Officer Huter exited our vehicle and approached the

6    defendant.

7    Q    And did you see him approach the defendant?

8    A    Yes.

9    Q    And could you hear what he was saying?

10   A    At first I heard him say something along the lines of, Can I

11   speak to you for a minute?

12   Q    Okay.  What happened next?

13   A    At that time I observed Mr. Lucas begin jumping and holding

14   his waist with his right hand.

15   Q    I'm sorry.  When you say jumping, what do you mean?

16   A    Like as Officer Huter was speaking to him, he began walking

17   backwards and eventually turning into a skip, where he was

18   actually skipping backwards.

19   Q    Okay.  Go ahead.

20   A    At that time, Officer Huter was closing and walking towards

21   him.  The defendant eventually turned, grabbed his waistband,

22   bent over at the waist, and started running eastbound on the

23   block.

24   Q    Prior to that, did you get out of the car?

25   A    No.

Case 1:09-cr-00560-RDB   Document 41   Filed 05/12/10   Page 49 of 93

1  Q    Okay.  Prior to Mr. Lucas turning around and running up

2  Wilkens, did you see Officer Huter draw his weapon?

3  A    No, I didn't.

4  Q    Did you see Officer Huter put his hands on Mr. Lucas at any

5  point?

6  A    No.

7  Q    You say that Mr. Lucas ran east up Wilkens, is that correct?

8  A    Yes.

9  Q    Okay.  Could you show the Court on the map where exactly he

10 went?

11 A    When Officer Huter met him, he came down the steps.  He was

12 like on the steps of the porch.  He started skipping here

13 (indicating).  Then he turned and began running through this area

14 off of Brunswick Street, off the sidewalk.

15 Q    Did you see if Officer Huter pursued him?

16 A    Yes, he chased him on foot.

17 Q    Okay.  And did you pursue?

18 A    I followed in the vehicle.

19 Q    Okay.  Can you show your route?

20 A    I just took Wilkens to Brunswick.

21 Q    Okay.

22 A    Right there.

23 Q    And you described Mr. Lucas's route going at an angle across

24 that green area at the corner of Wilkens and Brunswick, is that

25 correct?

1    A    Yes, sir.  He just cut, he cut the corner, so he didn't run

2    around the sidewalk.

3    Q    And where did he go from there?

4    A    He traveled southbound on Brunswick until homes ended, which

5    was all the way down here, at which point he made an abrupt right

6    and entered an extremely narrow alley between the home and fence.

7    Q    Okay.  And were you parallel to Mr. Lucas as he's running

8    down Brunswick?

9    A    Yes.  At times I was, you know, close to the curb.  And then

10   there were cars that I had to back back into the street.  I was

11   right next to him as he was running.

12   Q    Could you see Mr. Lucas clearly?

13   A    Yes.

14   Q    What was the illumination like on the street?

15   A    There are numerous street lamps.  I mean, it's a well lit

16   area.  There's a huge business which backs up where this incident

17   occurred.

18   Q    Did you notice anything about the way Mr. Lucas was running

19   as he went down Brunswick?

20   A    He was slumped, slumped at the waist, holding his waistband

21   as he was running.  To me it's characteristic of someone who's

22   armed.

23   Q    And you said at some point he cut up heading east again in

24   that alleyway, is that correct?

25   A    Yes, very narrow alley.

1    Q    Could you follow in your car?

2    A    No.

3    Q    Okay.  So where did you go at that point?

4    A    I --

5    Q    Hold on one second.  Let me move this map up slightly.

6         Sir, if you would, could you just show the Court the

7    route you took from the time Mr. Lucas went up that alleyway?

8    A    Once Mr. Lucas hit that alley right there, I continued in

9    the vehicle and I paralleled him, attempted to.  I went into the

10   parking lot up here.  I think I ended up over here somewhere.

11   Q    At some point did you return to Brunswick?

12   A    Yes.

13   Q    If you would, show the Court where you went.

14   A    I just continued right back out, stopped right at the alley.

15   I exited, got out on foot, and entered the alley where I observed

16   him run into.

17   Q    Okay.  And can you show the Court on the map where you found

18   Officer Huter?

19   A    Officer Huter, they were approximately right there.

20   Q    Okay.  And was Mr. Lucas with Officer Huter at this point?

21   A    Yes.  Officer Huter was attempting to place handcuffs on

22   him, place him under arrest.

23   Q    Okay.  At some point did you speak to Officer Huter?

24   A    Yes.

25   Q    And what did you say to him and what did he say to you?

1    A    Originally, when I went up to him, made sure the defendant

2    was, Huter was okay, and we stood the defendant up.  And Huter

3    began telling me, He threw a gun, threw a gun, check over there.

4    And, you know, he was directing me to, the alley is actually like

5    a 90 degree alley.  But he directed me to this area.

6    Q    Okay.  Let me show you what's been previously marked as

7    Government's Exhibit Number Three.  Do you recognize that?

8    A    That's the area that I recovered the gun.

9    Q    And where, if we were looking at the map, what is the area

10   that we're looking at?

11   A    That is if you're running into the alley westbound, that's

12   the 90 degree break before you make the right.  That's what

13   you're looking at.

14   Q    Does the picture here today look like the alley looked?

15   A    The alley's the same as far as the fences and how narrow it

16   is.  But it was overgrown with trees.  It was summertime.  And it

17   was just really overgrown in the back there in the summertime.

18   Q    And Officer Huter directed you to a particular location, is

19   that correct?

20   A    Yes.

21   Q    And how did he do that?

22   A    He just kept telling me, Go down, right there, it should be

23   right around there, right there.

24   Q    Okay.  And if you could show the Court, what, show the Court

25   what area he directed you towards.

1    A    It was this, this general area he was directing me towards.

2    Q    Okay.  And did you go to that area?

3    A    Yes.

4    Q    Did you have a flashlight with you?

5    A    Yes.

6    Q    Was it on?

7    A    Yes.

8    Q    Okay.  And could you see in that general area?  Was it well

9    illuminated?

10   A    Yes.  You could see but you had, you needed the flashlight

11   to illuminate the ground to actually look at objects.

12   Q    And what did you, what, if anything, did you find in the

13   area that Officer Huter directed you towards?

14   A    It was a fully loaded revolver.

15   Q    Where did you find it on the ground?

16   A    It was on top of leaves and just debris that was on the

17   ground.

18   Q    Was it in plain sight or did you have to search for it?

19   A    I mean, I had to look in the area.  And then I eventually

20   came to it.  I didn't have to move anything to get to it.  It was

21   right there.

22   Q    How long would you say it took you to find it?

23   A    It was less than a minute.  I just walked to where he told

24   me to go and it was right there.

25   Q    Okay.  Was there anything on top of it?

1    A    No.

2    Q    And you said you picked it up, is that correct?

3    A    Yes.

4    Q    Permission to approach, Your Honor?

5         THE COURT:  Certainly.

6    Q    Officer Laronde, I'm going to show you what's been marked as

7    Government's Exhibit Number Four.  Do you recognize that?

8    A    This is the revolver that was recovered that night.

9    Q    How do you know it's the same revolver?

10   A    Because I recovered it and this is the property tag that I

11   wrote.

12   Q    Okay.  Now, you said that there was some debris in the

13   alleyway where you found the firearm, is that right?

14   A    Yes.

15   Q    What else was on the ground?

16   A    There just, it's a typical dirty alley.

17   Q    Trash?

18   A    Trash, yes.

19   Q    Did you find any other guns in the area?

20   A    No.

21   Q    Did you find any other contraband in the area?

22   A    No.

23   Q    You said there was nothing on top of the gun, is that

24   correct?

25   A    Correct.

1    Q    When you picked it up, did you notice, was it particularly

2    dirty?

3    A    No.

4    Q    Did you notice if there was a lot of rust on it?

5    A    No rust, no cobwebs.

6    Q    Okay.  Was there any indication when you picked up that gun

7    and secured it that it had been exposed to the elements for an

8    extended period of time?

9    A    No.  But it was ready to fire.

10   Q    And what did you do with the weapon?

11   A    At that time I recovered it.  At that time, there were other

12   officers on scene.  We walked out to Brunswick Street, at which

13   time I unloaded it, made it secure.

14   Q    Were you wearing gloves, if you remember?

15   A    No.

16   Q    Okay.  And when you secured it, where did you put it?

17   A    In a bag, in the car.

18   Q    Okay.  And did you submit it to Evidence?

19   A    Yes.

20   Q    Okay.  Your Honor, no further questions.

21        THE COURT:  All right.  Thank you very much, Mr. Fuchs.

22   Ms. Newberger.

23        CROSS EXAMINATION

24   BY MS. NEWBERGER:

25   Q    Thank you.  Do you remember the name of the shooting suspect

1    you were looking for that night?

2    A    Not off the top of my head, no.

3    Q    When did you first learn about that shooting suspect?

4    A    Like I said, I don't remember if it was a couple days

5    before, but there was a picture.  We were all furnished with the

6    picture.

7    Q    I'm going to show you what's marked as Defendant's Exhibit

8    One.  Do you recall, is this the photograph that you were shown?

9    A    Yes.

10   Q    Okay.  And is this the exact sheet?  It says Baltimore

11   Police at the top, and then it has the photograph, and then

12   towards the bottom it has other information written.

13   A    Right.  500 Brunswick, yes.

14   Q    Okay.  So that's what you recall seeing?

15   A    Yes.

16   Q    And when would you have seen this?  How would it have been

17   given to you?

18   A    I don't know if it was at the read out, they had it at roll

19   call, it was in the mailboxes.  I don't know if our lieutenant

20   actually gave it to us.  But it was an ongoing thing.

21   Q    Okay.  Were you looking for him that night?

22   A    I had the picture of him.  We weren't sent out looking for

23   him.  But we ended up bumping into someone who looked like him.

24   Q    Did you have this sheet in the car with you?

25   A    I don't recall if it was in the car or not.

CROSS EXAMINATION OF OFFICER LARONDE                    57

1    Q    And what were you advised to do if you encountered this

2    individual?

3    A    I just, I had read the read-out and I just noticed the

4    picture.  I knew he was wanted.  I didn't even know if it was for

5    questioning or for a warrant.  I just remembered the picture and

6    I remembered the face.

7    Q    Okay.  And you were the first person to notice him on July

8    7th?

9    A    Yes, ma'am.

10   Q    And what about him struck you as this is our guy?

11   A    I didn't think it was our guy.  I just, when we were driving

12   by, we were actually going in for the night, it was 2:00.  And

13   when he was going up on the stairs, I saw the long braids and I

14   just, he was kind of a taller and bigger guy, so we stopped him

15   just to check him out.

16   Q    Okay.  And do you recall when Officer Huter got out of the

17   car, did he leave his door open?

18   A    I don't recall if he left it open or not.

19   Q    Do you remember if the windows were open?

20   A    I think the windows were open.

21   Q    And is that how you were able to hear what was going on?

22   A    No, I was close.  I mean, I was fairly close.

23   Q    Did you say anything to the defendant?

24   A    No.

25   Q    And what were you wearing that night, do you recall?

1    A    I had my vest on.  I know we were in plain clothes.  I had

2    my badge around my neck that I wear at all time.  I wear my vest

3    and I wear my badge over it.  Actually tuck it in and when I get

4    out of the car, take it out.

5    Q    Okay.  But you were still in the car?

6    A    Yes.

7    Q    So it's probably still tucked in?

8    A    At that point, yes.

9    Q    And do you recall what was the make and model of the car you

10   were driving?

11   A    That I don't remember.

12   Q    And do you remember approximately how fast you were driving

13   at the point that you noticed the defendant?

14   A    Casually going into the station.  We weren't speeding.

15   Still doing our regular patrol.  Just heading back into the

16   station.  As far as how fast we were going, I couldn't tell you

17   exactly.

18   Q    When you pulled up alongside the row houses that you

19   identified -- Your Honor, may I approach?

20           THE COURT:  Yes, certainly.

21   Q    Could you step down and label for me, point as, label with a

22   letter A where it was that you first pulled over?

23   A    I believe we pulled over right about, right here.

24   Q    Okay.  Can you label it with an A?

25   A    I'm sorry.

1   Q    And so it's approximately in front of this row house that's

2   on the out lane?

3   A    Correct.

4   Q    Okay.  And at that point, where was Mr., Mr. Lucas?

5   A    When Huter got out of the vehicle and approached him, Mr.

6   Lucas was right, coming back down off the porch.

7   Q    Okay.

8   A    So when I originally saw him, he was like at the door of one

9   of these houses.

10  Q    Okay.  So was his back to you when you first saw him?

11  A    No.  I saw him walking up the porch.  I saw him going to the

12  door.

13  Q    Okay.  But at the point that Officer Huter gets out of the

14  car, he's walking down the steps of that residence?

15  A    Well, he was standing by, standing at the top.  So front

16  view.

17  Q    Okay.  And do you recall, you said he was skipping?

18  A    Once Officer Huter started talking to him, he began, if you

19  were talking to me, he gave it one of these (indicating) and he

20  gave it one of those.

21  Q    And so that's when he's already off of the steps?

22  A    Yes.

23       THE COURT:  The record will reflect the witness

24  demonstrated skipping backward away from a person.

25  Q    And so he was skipping towards Brunswick?

1   A    Yes.

2   Q    Okay.  Approximately how long do you believe, how long

3   passed before, between when Officer Huter got out of the car and

4   when the defendant started running?

5   A    Less than 30 seconds.

6   Q    Okay.  Now, what did you do at that point?

7   A    I immediately followed my partner.

8   Q    Okay.  Were you able to stay in communication with him at

9   all?

10  A    I was on the radio advising the dispatcher that my partner

11  was in a foot chase 2700 block of Wilkens Avenue.

12  Q    And so when you called Dispatch on your radio, what happens

13  then?

14  A    I was looking for Huter.  I was on the radio and people were

15  coming towards the area.

16  Q    Okay.  So when you called Dispatch, they sent cars to the

17  area?

18  A    Correct.

19  Q    Okay.  And you were able to maintain sight of the defendant

20  and Officer Huter the whole time they were on Brunswick?

21  A    No.  Once, once they went into that alley, I didn't see them

22  at all.

23  Q    Okay.  So can you draw for me the same thing that you did on

24  the computer, but draw for me the route which you drove?

25  A    I followed them along the street.  When they turned down

1   Brunswick, there was one point when I was really close.  I got to

2   the the sidewalk and then there were cars.  I had to come back

3   out on the street all the way down.  Then, is that the alley --

4   they went down the alley here.

5   Q    Where did you go?

6   A    I continued to the parking lot.  I went up here.  Like I

7   said, I was in the parking lot.  I was in this area.

8   Q    Now, when you were in the parking lot, at any point did you

9   get out of the car to try to run toward where --

10  A    Yes.

11  Q    You did?

12  A    Yes.

13  Q    Okay.  So where, can you, can you draw for me where you ran,

14  or do you recall?

15  A    I was actually, I was listening to the radio.  I was calling

16  on the radio to tell them where they were.  So I was actually

17  trying to listen to hear if I heard Huter either running or

18  yelling because I believed the suspect was armed.  So I didn't

19  know where they were coming out.  So I think I either yelled

20  "Huter" and then I eventually, I think I saw his flashlight or

21  something drew my attention back.  And I turned around and went

22  back out.  Actually, a security guard actually stopped me in the

23  parking lot and was telling me to get out.

24  Q    Okay.  And so did you, so you never -- so you weren't able

25  to see through this fence to see where they were?

1   A    I think I eventually heard them over there or something.  I

2   couldn't really see, no.  I knew they were back there.  Either I

3   saw a light or something drew my attention back.  I went back

4   over there.

5   Q    Okay.  So either you saw a light or you heard.  You figured

6   out that they were still stuck over here?

7   A    Right.  Because it didn't come through.

8   Q    Okay.  But you couldn't quite see them through the fence?

9   A    Correct.

10  Q    Okay.  So you then get back into your car?

11  A    Yes.

12  Q    And you pull back out and you stop somewhere here on

13  Brunswick?

14  A    Yes.

15  Q    Now, at that point, have any of the backup cars arrived?

16  A    I think, there were cars, there were cars everywhere.  They

17  were coming around.  I don't know if they actually found him

18  or -- I know when I got back out there, he was putting him under

19  arrest and then he directed me to the gun.

20  Q    Okay.  When you were back there, were there other uniformed

21  officers that were with you?

22  A    Not at that time, no.

23  Q    Okay.  So it was just you, Officer Huter, and the defendant?

24  A    Correct.

25  Q    But when you parked your car on Brunswick, there were other

1   patrol vehicles there?

2   A    When I came out -- I don't know.  I actually was just, I

3   just got out and ran in the alley.  I don't know if they were

4   still driving.  Because my lights were on.  Like I said, I just

5   got out and ran down the alley.

6   Q    So the point you're running down that alleyway -- and I'm

7   going to show you Government's Exhibit Two.  Do you recognize

8   that as the alleyway that you had to run down to reach them?

9   A    Yes.

10  Q    Okay.  So you ran down that?

11  A    Yes.

12  Q    At that point, did you know whether Officer Huter had the

13  defendant under arrest?

14  A    No, I didn't.

15  Q    Okay.  So you didn't know what you were going to find when

16  you got to the end of that alley?

17  A    Right.  I wasn't sure, correct.

18  Q    Now, did you pull your gun?

19  A    No.

20  Q    Did you have a flashlight?

21  A    Yes.

22  Q    Was the flashlight on?

23  A    Yes.

24  Q    You brought it out of the car with you?

25  A    Yes.

1    Q    Would you have been able to see your way down this alleyway

2    without the flashlight?

3    A    It was illuminated but, I mean, you'd have to get your eyes

4    used to it.  It wasn't -- I mean, it's dark but you can still see

5    because there's enough lights around to illuminate the area.

6    It's not a shopping center where you can see but you can, it's

7    not pitch black.

8    Q    Does this photograph accurately depict the way that that

9    alleyway looked a year ago, approximately a year ago?

10   A    I don't remember.  I would assume not.  It was nighttime and

11   summertime.  So I'm assuming it was grown over more.

12   Q    So there was more debris and growth?

13   A    There was more, more bushes.

14   Q    Now, did you have to help Officer Huter get cuffs on Mr.

15   Lucas?

16   A    I think he had him cuffed.  I remember standing him up with

17   him and him telling me look for the gun.

18   Q    Okay.  So when Mr. Lucas was stood up, who was, who was

19   guarding him?

20   A    Officer Huter.

21   Q    Officer Huter.  Okay.  And you think it only took less than

22   a minute for you to find the firearm?

23   A    Took probably less than a minute, I'd say, yeah.  Because he

24   directed me and then I looked in that area and recovered it.

25   Q    And when was the first time that you interacted with any of

1    the uniformed officers who arrived?

2    A    By the time everything was recovered, everyone was back

3    there.  I was telling people where we were.  There was

4    communication going on between other people.  So there was, there

5    were units back there because it's right by the station.  So it

6    was flooded.

7    Q    Okay.  And do you remember who were some of the officers who

8    arrived at the scene?

9    A    No.  I don't recall any of those.

10   Q    Do you remember if Travan Smith came?

11   A    He may have.  Like I said, I don't remember.

12   Q    Do you remember any female officers showing up?

13   A    Like I said, whoever was on midnight, midnight shift, that

14   night, whoever was around came.  I don't know if they even

15   dropped a 13 on us.  But it was, you know, they were all, a ton

16   of officers there.

17   Q    What does that mean, drop a 13 on us?

18   A    Officer needs assistance.

19   Q    Okay.  So there were a lot of officers there at the scene?

20   A    Once we came out, I mean, I don't know if there were, there

21   were a bunch of cars there.

22   Q    And I thought you said also that there were some officers in

23   the back alley with you by the time --

24   A    Yes.  Yes.

25   Q    -- you found the firearm?

1   A    Yes.

2   Q    Okay.  And when you, at the time you found the firearm, was

3   Mr. Lucas still back in the alley?

4   A    Yes.

5   Q    Did you search Mr. Lucas at any point?

6   A    I think Huter searched him when he stood him up or an

7   officer searched him.  I don't know.  I recovered the gun and

8   then we walked out.

9   Q    Okay.  Were any of the officers who arrived from the

10  evidence, evidence technicians?

11  A    No.

12  Q    Were any evidence technicians called?

13  A    We didn't recover -- I didn't call anyone to recover the

14  gun.  I recovered it.

15  Q    Okay.  And were any photographs taken at the scene?

16  A    No.

17  Q    Okay.  And do you recall, did you and Officer Huter take Mr.

18  Lucas to the precinct or did the uniformed officers?

19  A    I think the wagon transported him into the district.

20  Q    Into the district.  So he was first taken to the

21  Southwestern District?

22  A    Yes.

23  Q    And then from there he would have gone to Central Booking?

24  A    Yes.

25  Q    May I have a moment, Your Honor?

1          THE COURT:  Certainly.

2          (Pause in Proceedings.)

3    BY MS. NEWBERGER:

4    Q    And then did you, did you write a report in this case?

5    A    I submitted it.  I didn't write any reports.

6    Q    So what does that mean that you submitted it?

7    A    I processed the gun, took pictures of the weapon, cleared

8    it, and made it ready to turn it into Evidence Control.

9    Q    Okay.  And Officer Huter wrote the report?

10   A    He processed and wrote the report, correct.

11   Q    How long have the two of you been partners?

12   A    Let me see.  I'm not sure.  Maybe a little over a year.

13   Q    Okay.  And in your, in your partnership, do you have to sign

14   off on reports that he writes?

15   A    Do I have to?  No.

16   Q    Do you sign off on the reports he writes?

17   A    Sometimes.

18   Q    Sometimes?  Did you do so in this case?

19   A    I don't remember.  I probably did but I'm not sure.

20   Q    Okay.  And do you, are you usually the one who drives?

21   A    We rotate with six people.  So it changes, changes daily.

22   Our partners change up and we change up.

23   Q    So there's a core of six of you that are always partnered

24   with each other into twos?

25   A    This particular night, this was a detail in reference to

Case 1:09-cr-00560-RDB   Document 41   Filed 05/12/10   Page 68 of 93

1    violence in the area.  So I think it was just myself and Officer

2    Huter.  There was no one else working this shift from our squad.

3    We were just assigned to work extra in that area.

4    Q    And that night you were Southwest Operations?

5    A    Yes.  But it was, as far as, it was a day, I think it was a

6    day we were supposed to have off but we were, we had to work that

7    weekend in reference to the violence that was occurring in that

8    area.

9    Q    Okay.  But you're not assigned to a speciality squad or are

10   you?

11   A    It's a Flex.  It's an Operations Squad.  It's a Flex Unit.

12   Q    It's a Flex Unit.  Have you always been at the Southwestern

13   District?

14   A    Yes.

15   Q    Have you ever been assigned to any other division than

16   Operations?

17   A    I was in patrol for a year and then I went to Operations.

18   And I moved around in Operations.  I actually went back to patrol

19   for about six months and then back to Operations again.

20   Q    Okay.  And I have one more question that takes us backwards

21   a little bit.  You don't remember the make and model of the car

22   you were driving?

23   A    No.

24   Q    Was it, did it have tinted windows?

25   A    Did it have tinted windows?  Honestly, I'm not sure.  I

1    think it was, it was a car with lights.  That's all I remember.

2    Because I know I put my lights on.  I was driving around looking

3    for him.

4    Q    It was a car with lights.  You mean like sirens?

5    A    It either had dash lights or it was -- unmarked, so it had

6    lights inside the car.

7    Q    Apologize, Your Honor.

8              (Pause in Proceedings.)

9              MS. NEWBERGER:  I have no further questions, Your

10   Honor.

11             THE COURT:  Thank you.  Any redirect, Mr. Fuchs?

12             REDIRECT EXAMINATION

13   BY MR. FUCHS:

14   Q    Very briefly, Your Honor.  Officer Laronde, when you marked

15   on this map locations where certain things occurred, are you

16   showing the Court the exact location of where that occurred or

17   are you just giving a general sense of your recollection?

18   A    It's just approximate.  Everything's approximate.

19   Q    And when you talk about the amount of time that elapsed

20   between A event happened and B event happened, and your testimony

21   today, is that exact amount of time that happened or just

22   approximation?

23   A    Just approximation.  Between adrenalin and worrying about

24   your partner.  I didn't have a watch so I don't know.

25   Q    Understood.  Final question.  When you were searching for

1   the gun, Officer Huter directed you to a general location,

2   correct?

3   A     Correct.

4   Q     Did you find the gun easily or did it take you a while?

5   A     Surprisingly, it was fairly fast from where he directed me.

6   A couple seconds.

7   Q     Thank you.  No further questions, Your Honor.

8          THE COURT:  All right.  Thank you, Officer Laronde.

9   You may step down.  You can go outside in the hallway.  You

10  should not discuss your testimony with anyone, including Officer

11  Huter, in the event that you were called back to the witness

12  stand, until this hearing concludes.

13         THE WITNESS:  Thank you.

14         THE COURT:  Thank you very much.

15         MR. FUCHS:  Your Honor, that completes the government's

16  presentation.

17         THE COURT:  Any witnesses to be called by the defense?

18         MS. NEWBERGER:  No, Your Honor.

19         THE COURT:  So we're ready for legal argument, is that

20  correct?

21         MS. NEWBERGER:  Yes, Your Honor.

22         THE COURT:  All right.  Can Officer Huter and Officer

23  Laronde come back into the courtroom?

24         MS. NEWBERGER:  That's fine, Your Honor.

25         THE COURT:  All right.  Officer Laronde and Officer

1   Huter, you can come back into the courtroom.  Actually, I just

2   have one other question, just for my purposes.  Could you put

3   Defendant's Exhibit One up on the screen, please?  It's an item

4   in evidence in this hearing.

5          MS. NEWBERGER:  Your Honor, I have a hard copy.  It

6   doesn't come up very --

7          THE COURT:  My question is, I'm looking at Defendant's

8   Exhibit One and I'm just trying to make sure I'm not confused on

9   the facts here.  Defendant Exhibit One bears such a likeness to

10  the defendant, Mr. Lucas, I'm just verifying there's not an

11  allegation of this being an alias.  There's no contention, is

12  there, that Mr. Lucas is, in fact, Laurence Jones, is there?

13         MR. FUCHS:  There's not, Your Honor.

14         THE COURT:  I just was unclear.  This can go back and

15  be an item of evidence.  The likeness is so strong that I thought

16  for a minute I might have missed something, that there was some

17  contention that it was an alias of Mr. Lucas being Laurence

18  Jones.

19         MS. NEWBERGER:  No, Your Honor.

20         THE COURT:  Okay.  So there's no alias involved here.

21  All right.  I'll be glad to hear from you, Ms. Newberger.

22         Let me begin by just asking you in terms of the facts

23  of this case, your client is denying ownership of the gun in

24  question, correct?

25         MS. NEWBERGER:  Your Honor, if I may defer to Mr.

1    Hurson, who is going to argue.

2              THE COURT:  That's fine.  Mr. Hurson can argue.

3              MR. HURSON:  She asked me.  Yeah.  We are, we are

4    essentially, for purposes of this hearing, the government has put

5    forth factual representations or we have pleaded not guilty and

6    maintained that plea.

7              THE COURT:  All right.  So the point is is that in the

8    context of this hearing, your client is denying ownership of the

9    gun in question, correct?

10             MR. HURSON:  Well, my client obviously has not

11   testified.  I see where Your Honor's going with respect to

12   abandonment, I assume.

13             THE COURT:  I guess my question is, is that the facts

14   before me are that the individual whom the government contends is

15   Mr. Lucas abandoned the gun.  And I don't know where there's any

16   standing to raise a suppression issue here.

17             MR. HURSON:  That's most likely why Ms. Newberger asked

18   me to argue this.  I think that the, the arguments will been

19   brief, Your Honor.  I understand what we're up against.  The

20   government has cited a number of Fourth Circuit cases.  But in

21   essence, we are talking about Hodari D here.  We're talking about

22   the case --

23             THE COURT:  Well, I'll get to Hodari.  Before we even

24   get to Hodari --

25             MR. HURSON:  Well, that's the question of whether the

1 officer --

2    THE COURT:  You're referring to California v. Hodari D

3 at 499 U.S. 621, a 1991 case, with respect to whether a defendant

4 is seized for Fourth Amendment purposes essentially when the

5 defendant does not acquiesce initially.

6    MR. HURSON:  The question is really submission to

7 authority.  And I understand --

8    THE COURT:  Before we get there, do we have a question

9 of standing here, Mr. Hurson?

10    MR. HURSON:  Well, the question is, a great lawyer

11 answer, yes and no.  I think our point is, accepting the

12 government's facts for purposes of this hearing, that this is the

13 man who ran down the alley and allegedly threw a firearm, our

14 question, our debate would really be when and if he was seized

15 and whether they had a right to chase him.

16    Our position is simply this, Your Honor; that Hodari D

17 does stand for the principle that until someone acquiesces to

18 police authority, they are not seized.  So anything they throw in

19 the process of fleeing, they can't come in and claim that it was

20 unlawfully taken from them.

21    Hodari D, however, was a case where the officers were

22 wearing, both on the front and the back of their jackets, clearly

23 marked as police officers.  What has happened in this case and

24 what has happened in the city is that a lot of this on-the-ground

25 police work has been essentially given to plain clothed officers.

1        And what is happening is officers are in what they call

2    high crime areas, exiting vehicles and saying to individuals,

3    Hey, I want to talk to you.  When those individuals do not

4    immediately react with submission, but yet rightfully so, may

5    run, the officers are then given carte blanche to chase them,

6    tackle them, do what they will.

7        In this case, I know Your Honor has said there's a

8    striking resemblance, but in fact we heard from Officer Laronde

9    that he didn't even think this was, by this I mean government's,

10   Defendant's Exhibit One, that this was Mr. Lucas.  But yet they

11   still chased him.  I know at 4:15 on a Friday we may not be in

12   the mood to overrule Hodari D.  But in a situation where officers

13   are in plain clothes and an individual has no idea who and why

14   someone is after him, I think the law simply cannot sanction

15   police officers being able to chase citizens for whatever reason

16   they want to.

17       In this case, there was, if you take Officer Huter's,

18   an honest mix-up.  If we take Officer Laronde, who's simply

19   questioning.  Anybody with dreadlocks who was African American

20   that night could have been chased by the police and there would

21   be, unfortunately, no remedy for that.

22       THE COURT:  I don't know being chased by the police.

23   The person walks up and says, Yes, officer can I help you?

24       MR. HURSON:  Well, at 2 a.m. in a dangerous

25   neighborhood, as they have called it, one cannot be blamed for

1    choosing to flee when confronted with plain clothes individuals

2    in an unmarked vehicle.  In fact, I mean, we're taught --

3              THE COURT:  Well, the evidence is undisputed before,

4    Mr. Hurson, that the police officer had his badge around him.

5              MR. HURSON:  Well, he had his badge down on his hip.

6    And he's wearing -- we've seen photos.  They're not in evidence.

7    Can't really remember if we've seen photos of what he was

8    wearing.  It was very plain clothes.  He doesn't identify himself

9    clearly in his clothing or in his vehicle.

10             I mean, we're taught if you're pulled over by somebody

11   and you don't know if it's the police, to proceed until you get

12   to a place where you know it's safe.

13             The ice is thinning, I recognize that.  But I will say

14   only this; that if there is a way to distinguish what happened

15   here, if someone is chased by officers who are not clearly

16   officers, the law should recognize that they're seized at the

17   point at which they're told to stop.  And as the ice thins to the

18   thinnest point, I would say there was testimony that Mr. Lucas

19   did, in fact, slow, Hodari D does say that you are seized even

20   temporarily if you acquiesce to the authorities.  And that

21   slowing by the officer, Officer Huter's testimony, came allegedly

22   at the time the gun was tossed.

23             Finally, Your Honor, after Heller, the right to possess

24   a firearm is a fundamental right.  And frankly, having a weapon

25   should not give rise to any probable cause to seize an individual

1   post Heller.

2           THE COURT:  Thank you, Mr. --

3           MR. HURSON:  Thank you.

4           THE COURT:  -- Hurson, with respect to an effort to

5   skate as best one can on very thin ice -- I see you smiling

6   here -- in terms of the difficulty of your legal position, trying

7   to skate on very thin ice.

8           Mr. Fuchs, do you want to be heard on this?

9           MR. FUCHS:  Your Honor, I would just point out the

10  factual issue.  Officer Huter testified that he identified

11  himself verbally as a police officer.

12          THE COURT:  Yes.  It's undisputed that he said that.

13          MR. FUCHS:  Correct, Your Honor.  Beyond that, Your

14  Honor, the government will submit.

15          THE COURT:  Thank you very much.  First of all, with

16  respect to any policy arguments raised by the defense that, in a

17  strong effort to try to dance through the law on this, this is

18  not a situation, from what I can see, of just randomly just

19  chasing people down the street.  The facts of this case heartily

20  demonstrate that, just in the general context.

21          I have the ability to look at the evidence in the case,

22  look at the defendant.  The picture of Laurence Jones,

23  Defendant's Exhibit One, bears such a remarkable likeness to the

24  defendant before me in terms of not just the length of the hair

25  and the dreadlocks and the partial mustache, but even the shirt

1    the defendant's wearing before me today is a collarless shirt

2    that looks just like the photograph.

3          So I in all candor have to ask, because I wasn't sure

4    if there was some contention that Lawrence Jones is an alias for

5    Mr. Lucas.  That's how strong the resemblance is.  I make that

6    observation as a matter of fact just here in court here today.

7          But be that as it may, you start with the fact, the

8    very basic fact that with respect to the defendant's motion here,

9    that the defendant has no standing to challenge the seizure of

10   the gun in question in this case in the wee hours of July the 7th

11   of 2009.  It's axiomatic.  That those who abandon property have

12   no challenge, have no standing to challenge the seizure.

13         The cases are well listed, Abel v. United States, 362

14   U.S. 217, a 1960 opinion.  There's the Fourth Circuit opinion in

15   United States v. Stevenson at 396 F.3d 538, a discussion at Pages

16   546 and 547, a Fourth Circuit opinion, 2005, in which certiorari

17   was denied by the Supreme Court.  United States v. McDonald, 61

18   F.3d 248, a Fourth Circuit opinion, 1995.

19         Therefore, it's very basic that if a suspect denies the

20   ownership of certain property, which is the case here, Mr. Lucas

21   is clearly denying ownership of the property, the gun in

22   question, he loses standing he might have otherwise had to

23   challenge it in some way.

24         The Supreme Court case again is Rawlings v. Kentucky,

25   448 U.S. 98, a Supreme Court opinion in 1980.  So there is simply

1    no standing here to challenge.

2              The government has furthermore cited, in addition to

3    the Abel case, the government has cited other cases in supporting

4    the same proposition.  He surrenders any expectation of privacy

5    when he throws, when the facts are that he throws the gun in a

6    public street.  It's not a matter of a factual matter.  I mean,

7    the defendant is in a conundrum when they seek to argue the facts

8    of the case, and yet they're faced with the fact that Mr. Lucas

9    has no standing to challenge seizure as to property that has been

10   abandoned.

11             But apart from that, in terms of the analysis to be

12   undertaken here in terms of the authority under what Mr. Hurson

13   has noted is Hodari D, the reference is to the case of California

14   v. Hodari D, 499 U.S. 621, essentially the defendant is not

15   seized for Fourth Amendment purposes by the show of police

16   authority.

17             The government specifically has noted that a person who

18   flees from the police is not seized for Fourth Amendment purposes

19   until he's apprehended or submits to the police officer's

20   assertion of authority.  That's exactly what occurred here.  He

21   wasn't seized.  There was flight.  So he was not seized literally

22   until Officer Huter essentially was able to apprehend him and get

23   him under control and place him in custody with handcuffs.

24             So with respect to any arrest, the arrest is permitted

25   here in this case under the general totality of the circumstances

1    test as set forth by the Supreme Court in Illinois v. Gates here,

2    with respect to the totality of the circumstances here.

3            And with respect to the matter of the warrantless

4    arrest, Judge Niemeyer, in addition to the matter of the

5    principles of Illinois v. Gates, in which the Supreme Court held

6    that probable cause is a fluid concept, the Fourth Circuit, Judge

7    Niemeyer of the Fourth Circuit, in a case of United States v.

8    Dickey-Bey, discussed this principle at 393 F.3d. 449, at 451, a

9    Fourth Circuit opinion, 2004.

10           Based upon the totality of the circumstances here,

11   clearly, there was an appropriately warrantless arrest that is

12   permitted under the standards of Illinois v. Gates, as well as

13   U.S. v. Dickey-Bey in this case.  And indeed, as Judge Niemeyer

14   noted in the Dickey-Bey opinion, under a pragmatic common sense

15   approach, the Fourth Circuit noted that it deferred to the

16   expertise and experience of law enforcement officers at the

17   scene; at bottom, the proper standard is to protect citizens from

18   rash and unreasonable interferences with privacy and from

19   unfounded charges of crime, while at the same time giving fair

20   leeway for enforcing the law in the community's protection.

21           Judge Niemeyer, in that opinion of U.S. v. Dickey-Bey

22   at 393 F.3d 453 to 454, quoted the Supreme Court case of Pringle

23   at 124 Supreme Court at 799, which in turn quoted earlier Supreme

24   Court authority, Brinegar v. United States, at 338 U.S. 160,

25   discussion at 176, a 1949 case.

1          It is abundantly clear that, first, the defendant has

2     no standing based upon the clear evidence as to the abandonment

3     of the gun and no standing to challenge the seizure of the gun.

4     Furthermore, the police officers have probable cause to arrest

5     Mr. Lucas on the facts of this case, in a high crime area and his

6     flight to avoid arrest, as well as his reach, what has not been

7     discussed much thus far, the reaching down to the waistband,

8     which is behavior consistent with that of an armed person.

9          Furthermore, I would note the testimony of Officer

10    Huter with respect to his observations.  I've had an opportunity

11    to observe Officer Huter.  I've had an opportunity to observe him

12    under careful cross examination by experienced defense counsel.

13    And I find him to be totally credible.  There's absolutely no

14    indicia of Officer Huter having any vendetta against Mr. Lucas or

15    manufacturing facts, or someone trying to, as they say, drop a

16    gun on another individual.

17         There's no evidence that the gun appeared to be rusted

18    or was an old gun, had been out in the field for a period of

19    time.

20         And the evidence is, quite frankly, quite clear that in

21    this case, that Officer Huter observed what he observed and has

22    testified truthfully before me.  And I have no reason to in any

23    way question his credibility with respect to what he saw.

24         Officer Laronde just arrives and then just reacts to

25    what Officer Huter observed and did not in any way, there was no

1    allegation that Officer Laronde is essentially manufacturing

2    facts or dropping a gun on Mr. Lucas, as they say, mainly because

3    Officer Huter specifically just -- Officer Laronde just

4    specifically reacted to what Officer Huter had said to him.

5            So with respect to the probable cause that is required

6    here, I would note that there was clearly probable cause to

7    believe that there was some type of criminal offense that had

8    been committed or was being committed.  There was certainly a

9    reasonable suspicion that gave rise to a finding of probable

10   cause for the warrantless arrest of the defendant.

11           So for those reasons, the defendant's motion to

12   suppress tangible and derivative evidence, Paper Number 16, is

13   denied.  And the clerk will prepare an order indicating that that

14   motion has been denied for the reasons set forth on the record.

15           And I'll sign that order right now.  Thank you, Madam

16   Clerk.

17           For the reasons stated in open court today, on April

18   23, 2010, it's ordered that the motion to suppress evidence,

19   Paper Number 16, filed by defendant Lewis Kevin Lucas, is denied.

20   Sign that order today.  Thank you, Madam Clerk.

21           Make sure these exhibits are made part of the court

22   file.  As long as we have the original exhibits of that.  Do we

23   have the originals here?

24           THE CLERK:  These are the copies that they want you to

25   have.

1          THE COURT:  That's fine.  These are my copies.  But you

2    have the originals.  You can return them to counsel, but they

3    need to be retained for the record, obviously.

4          THE CLERK:  Yes.

5          THE COURT:  All right.  Thank you very much.  Is there

6    anything further from the point of view of the government on this

7    matter, Mr. Fuchs?

8          MR. FUCHS:  No, Your Honor.  Thank you.

9          THE COURT:  All right.  Is there anything further from

10   the point of view of the defendant on this matter, Ms. Newberger

11   or Mr. Hurson?

12          MS. NEWBERGER:  No, Your Honor.

13          THE COURT:  All right.  This Court therefore stands

14   adjourned.  And thank you, staff, for coordinating my moving

15   around a little bit this afternoon.  You not have a quick talking

16   judge, you have a moving judge here today.  Double duty for you

17   today.

18          With that, this court stands adjourned, and you all

19   have a nice weekend.

20          (Conclusion of Proceedings at 4:48 p.m.)

21

22

23

24

25

83

1                     REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4   stenographically the proceedings in the matter of USA v. Lewis

5   Kevin Lucas, Case Number(s) RDB-09-560, on April 23, 2010.

6          I further certify that the foregoing pages constitute

7   the official transcript of proceedings as transcribed by me to

8   the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10  signature this _____ day of _____, 2010.

11

12

13

14        _____

          Mary M. Zajac,
15        Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**0**

**09-CR-0560** [1] - 2:7

**1**

**101** [1] - 1:23
**124** [1] - 79:23
**13** [2] - 65:15, 65:17
**14th** [1] - 5:8
**150** [1] - 4:9
**16** [5] - 3:9, 3:13, 3:15, 81:12, 81:19
**160** [1] - 79:24
**176** [1] - 79:25
**1949** [1] - 79:25
**1960** [1] - 77:14
**1972** [1] - 4:10
**1980** [1] - 77:25
**1991** [1] - 73:3
**1995** [1] - 77:18
**19th** [1] - 5:9

**2**

**2** [3] - 9:14, 11:1, 74:24
**2004** [1] - 79:9
**2005** [1] - 77:16
**2009** [3] - 9:11, 44:17, 77:11
**2010** [4] - 1:10, 81:18, 83:5, 83:10
**21201** [1] - 1:24
**217** [1] - 77:14
**21st** [1] - 4:3
**23** [3] - 1:10, 81:18, 83:5
**24** [2] - 41:20, 41:22
**248** [1] - 77:18
**25** [2] - 4:23, 6:10
**2700** [7] - 9:22, 10:3, 11:6, 14:13, 45:22, 46:12, 60:11
**2:00** [2] - 48:1, 57:12

**3**

**3** [1] - 2:1
**30** [2] - 30:13, 60:5
**338** [1] - 79:24
**35** [1] - 9:22
**362** [1] - 77:13
**393** [2] - 79:8, 79:22
**396** [1] - 77:15

**4**

**405** [1] - 4:9
**448** [1] - 77:25
**449** [1] - 79:8
**451** [1] - 79:8
**453** [1] - 79:22
**454** [1] - 79:22
**499** [2] - 73:3, 78:14
**4:15** [1] - 74:11
**4:48** [1] - 82:20

**5**

**500** [1] - 56:13
**538** [1] - 77:15
**546** [1] - 77:16
**547** [1] - 77:16
**5515** [1] - 1:23

**6**

**6** [2] - 9:14, 25:10
**600** [1] - 11:4
**61** [1] - 77:17
**621** [2] - 73:3, 78:14
**6th** [2] - 45:1, 45:5

**7**

**799** [1] - 79:23
**7th** [9] - 9:11, 21:17, 44:17, 45:1, 45:2, 45:7, 45:9, 57:8, 77:10

**8**

**8** [1] - 44:16
**835** [1] - 44:22

**9**

**90** [2] - 52:5, 52:12
**900** [2] - 15:20, 40:15
**98** [1] - 77:25

**A**

**a.m** [3] - 9:14, 11:1, 74:24
**abandon** [1] - 77:11
**abandoned** [2] - 72:15, 78:10
**abandonment** [2] - 72:12, 80:2

**Abel** [2] - 77:13, 78:3
**ability** [1] - 76:21
**able** [16] - 5:21, 19:18, 29:13, 30:17, 33:3, 36:20, 36:22, 37:18, 42:3, 57:21, 60:8, 60:19, 61:24, 64:1, 74:15, 78:22
**abrupt** [1] - 50:5
**absolutely** [1] - 80:13
**abundantly** [1] - 80:1
**accepting** [1] - 73:11
**access** [3] - 5:19, 6:5, 42:4
**accordingly** [1] - 8:7
**accurate** [3] - 10:4, 45:24, 83:8
**accurately** [1] - 64:8
**acquiesce** [2] - 73:5, 75:20
**acquiesces** [1] - 73:17
**addition** [2] - 78:2, 79:4
**address** [3] - 6:1, 7:6, 30:9
**adjacent** [1] - 17:24
**adjourned** [2] - 82:14, 82:18
**admitted** [1] - 23:20
**adrenalin** [1] - 69:23
**advised** [1] - 57:1
**advising** [1] - 60:10
**aerial** [1] - 45:22
**Affairs** [1] - 6:24
**affirmatively** [1] - 42:11
**affixed** [1] - 83:9
**African** [1] - 74:19
**afternoon** [6] - 2:11, 2:13, 2:16, 2:17, 22:4, 82:15
**ago** [3] - 3:5, 64:9
**ahead** [2] - 16:15, 48:19
**air** [2] - 10:11, 45:13
**alias** [4] - 71:11, 71:17, 71:20, 77:4
**allegation** [2] - 71:11, 81:1
**allegations** [1] - 6:10
**allegedly** [2] - 73:13, 75:21
**alley** [31] - 16:22, 17:8, 17:10, 17:11, 18:20, 20:16, 30:1, 36:15, 36:16, 38:3, 38:5, 38:6, 50:6, 50:25, 51:8, 51:14, 51:15, 52:4, 52:5, 52:11, 52:14, 54:16, 60:21, 61:3, 61:4, 63:3, 63:5, 63:16, 65:23, 66:3, 73:13
**alley's** [1] - 52:15
**alleyway** [12] - 17:14, 17:22, 18:2, 20:17,

38:24, 50:24, 51:7, 54:13, 63:6, 63:8, 64:1, 64:9
**allow** [2] - 7:9, 7:14
**alongside** [1] - 58:18
**ambit** [2] - 4:9, 4:21
**Amendment** [3] - 73:4, 78:15, 78:18
**AMERICA** [1] - 1:4
**America** [1] - 2:6
**American** [1] - 74:19
**amount** [2] - 69:19, 69:21
**analysis** [1] - 78:11
**analyze** [1] - 8:7
**angle** [1] - 49:23
**answer** [1] - 73:11
**apart** [1] - 78:11
**apologize** [2] - 2:3, 69:7
**appeal** [1] - 5:19
**Appeals** [1] - 5:21
**appear** [2] - 9:24, 10:4
**Appearances** [1] - 1:15
**appeared** [1] - 80:17
**appointed** [1] - 3:6
**apprehend** [1] - 78:22
**apprehended** [1] - 78:19
**approach** [7] - 13:18, 21:4, 27:3, 48:7, 54:4, 58:19, 79:15
**approached** [2] - 48:5, 59:5
**approaching** [2] - 12:7, 14:1
**appropriately** [1] - 79:11
**approximate** [6] - 12:3, 17:14, 36:6, 46:2, 69:18
**approximation** [7] - 12:2, 20:2, 20:3, 21:3, 43:12, 69:22, 69:23
**April** [4] - 1:10, 4:3, 81:17, 83:5
**area** [70] - 9:21, 10:5, 10:7, 10:11, 10:12, 11:10, 12:5, 12:7, 13:12, 13:15, 14:23, 14:24, 15:7, 15:8, 15:24, 17:25, 18:1, 18:22, 19:9, 20:9, 20:15, 21:1, 21:10, 29:1, 30:3, 31:21, 31:24, 32:11, 36:6, 36:7, 37:5, 37:6, 39:2, 39:11, 43:11, 44:21, 44:22, 45:11, 45:13, 45:14, 45:25, 46:2, 49:13, 49:24, 50:16, 52:5, 52:8, 52:9, 52:25, 53:1, 53:2, 53:8, 53:13, 53:19, 54:19,

54:21, 60:15, 60:17, 61:7, 64:5, 64:24, 68:1, 68:3, 68:8, 80:5
**areas** [1] - 74:2
**argue** [4] - 72:1, 72:2, 72:18, 78:7
**argument** [1] - 70:19
**arguments** [2] - 72:18, 76:16
**arisen** [1] - 8:6
**arm** [2] - 35:5, 35:8
**armed** [6] - 13:16, 16:1, 50:22, 61:18, 80:8
**arms** [1] - 37:1
**arrest** [20] - 20:18, 24:14, 24:17, 30:12, 41:14, 41:15, 42:1, 42:7, 42:14, 42:17, 51:22, 62:19, 63:13, 78:24, 79:4, 79:11, 80:4, 80:6, 81:10
**arrive** [2] - 19:19, 19:24
**arrived** [5] - 20:4, 62:15, 65:1, 65:8, 66:9
**arrives** [1] - 80:24
**arrow** [1] - 27:18
**assertion** [1] - 78:20
**assigned** [2] - 22:5, 44:14, 45:14, 68:3, 68:9, 68:15
**assignment** [2] - 9:7, 44:13
**assistance** [1] - 65:18
**assume** [2] - 64:10, 72:12
**assuming** [1] - 64:11
**ATF** [1] - 2:9
**attempted** [1] - 51:9
**attempting** [1] - 51:21
**attention** [3] - 45:15, 61:21, 62:3
**authorities** [1] - 75:20
**authority** [7] - 19:14, 73:7, 73:18, 78:12, 78:16, 78:20, 79:24
**available** [2] - 5:1, 7:16
**Avenue** [4] - 9:22, 11:21, 47:4, 60:11
**avoid** [1] - 80:6
**aware** [4] - 3:13, 8:3, 8:5, 8:6
**axiomatic** [1] - 77:11

**B**

**backed** [1] - 13:20
**backing** [1] - 18:25
**backs** [1] - 50:16
**backup** [3] - 31:1, 31:3,

62:15
**backward** [1] - 59:24
**backwards** [3] - 48:17, 48:18, 68:20
**badge** [8] - 12:19, 25:18, 31:9, 31:10, 58:2, 58:3, 75:4, 75:5
**bag** [1] - 55:17
**balance** [1] - 36:17
**Baltimore** [6] - 1:11, 1:24, 4:5, 9:6, 44:12, 56:10
**bare** [1] - 41:5
**based** [4] - 24:5, 24:7, 79:10, 80:2
**basic** [2] - 77:8, 77:19
**bat** [1] - 2:25
**bearing** [1] - 3:22
**bears** [2] - 71:9, 76:23
**beforehand** [2] - 30:11, 30:13
**began** [4] - 48:16, 49:13, 52:3, 59:18
**begin** [2] - 48:13, 71:22
**beginning** [1] - 29:5
**Behalf** [2] - 1:16, 1:18
**behalf** [1] - 2:11
**behavior** [1] - 80:8
**behind** [2] - 14:18, 18:11
**belabor** [1] - 8:4
**belaboring** [1] - 8:4
**belt** [6] - 26:4, 26:5, 26:13, 31:14, 33:11, 33:12
**bent** [1] - 48:22
**best** [1] - 76:5
**between** [8] - 16:6, 16:20, 16:22, 50:6, 60:3, 65:4, 69:20, 69:23
**Bey** [4] - 79:8, 79:13, 79:14, 79:21
**beyond** [1] - 76:13
**bigger** [2] - 43:10, 57:14
**bit** [3] - 27:5, 68:21, 82:15
**black** [6] - 18:16, 19:2, 21:10, 21:19, 35:5, 64:7
**blamed** [1] - 74:25
**blanche** [1] - 74:5
**block** [12] - 9:22, 10:3, 11:4, 11:6, 14:13, 15:20, 30:3, 40:15, 45:22, 46:12, 48:23, 60:11
**body** [3] - 35:5, 35:10, 35:11
**Booking** [1] - 66:23
**bottom** [2] - 56:12, 79:17

**braids** [1] - 57:13
**break** [1] - 52:12
**Brendan** [2] - 1:19, 2:14
**brief** [2] - 7:8, 72:19
**briefly** [2] - 43:6, 69:14
**Brinegar** [1] - 79:24
**bring** [2] - 6:2, 28:23
**brought** [2] - 28:24, 63:24
**Brunswick** [29] - 11:5, 15:21, 16:3, 16:11, 16:18, 16:19, 17:8, 17:10, 17:15, 40:15, 40:16, 42:25, 45:23, 46:24, 47:8, 49:14, 49:20, 49:24, 50:4, 50:8, 50:19, 51:11, 55:12, 56:13, 59:25, 60:20, 61:1, 62:13, 62:25
**bumping** [1] - 56:23
**bunch** [1] - 65:21
**burden** [1] - 3:23
**bushes** [1] - 64:13
**business** [1] - 50:16
**button** [1] - 33:22
**BY** [13] - 9:4, 10:24, 22:3, 24:4, 27:14, 41:19, 43:5, 44:8, 45:10, 46:21, 55:24, 67:3, 69:13

# C

**calculation** [1] - 20:1
**California** [2] - 73:2, 78:13
**camera** [1] - 4:7
**cameraman** [2] - 17:9, 17:12
**candor** [1] - 77:3
**cannot** [2] - 74:14, 74:25
**car** [43] - 9:17, 9:19, 12:17, 15:10, 15:15, 15:16, 17:25, 26:15, 26:16, 26:19, 28:23, 30:14, 30:16, 31:5, 32:8, 32:10, 32:14, 38:6, 38:10, 38:14, 40:19, 46:7, 47:20, 48:24, 51:1, 55:17, 56:24, 56:25, 57:17, 58:4, 58:5, 58:9, 59:14, 60:3, 61:9, 62:10, 62:25, 63:24, 68:21, 69:1, 69:4, 69:6
**careful** [1] - 80:12
**carry** [2] - 26:14, 26:15
**cars** [9] - 40:3, 40:4, 50:10, 60:16, 61:2, 62:15, 62:16, 65:21

**carte** [1] - 74:5
**case** [33] - 2:5, 5:9, 5:15, 5:17, 6:5, 7:2, 23:10, 41:11, 43:17, 67:4, 67:18, 71:23, 72:22, 73:3, 73:21, 73:23, 74:7, 74:17, 76:19, 76:21, 77:10, 77:20, 77:24, 78:3, 78:8, 78:13, 78:25, 79:7, 79:13, 79:22, 79:25, 80:5, 80:21
**CASE** [1] - 1:5
**Case** [2] - 2:7, 83:5
**cases** [7] - 3:6, 6:4, 6:6, 6:22, 72:20, 77:13, 78:3
**casually** [1] - 58:14
**catch** [1] - 36:20
**cautionary** [1] - 6:16
**CC** [1] - 21:13
**cell** [1] - 33:7
**center** [3] - 31:25, 32:1, 64:6
**Central** [1] - 66:23
**certain** [5] - 30:20, 34:19, 43:8, 69:15, 77:20
**certainly** [16] - 6:14, 7:1, 7:11, 7:13, 7:20, 7:21, 8:6, 9:2, 21:5, 27:4, 41:17, 44:10, 54:5, 58:20, 67:1, 81:8
**CERTIFICATE** [1] - 83:1
**certify** [2] - 83:3, 83:6
**certiorari** [1] - 77:16
**challenge** [9] - 7:12, 7:22, 77:9, 77:12, 77:23, 78:1, 78:9, 80:3
**chambers** [1] - 5:2
**change** [1] - 67:22
**changes** [2] - 67:21
**characteristic** [2] - 13:16, 50:21
**characteristics** [1] - 16:1
**charges** [2] - 45:4, 79:19
**chase** [5] - 31:19, 60:11, 73:15, 74:5, 74:15
**chased** [6] - 15:13, 49:16, 74:11, 74:20, 74:22, 75:15
**chasing** [6] - 15:9, 15:11, 32:2, 33:2, 33:17, 76:19
**check** [2] - 52:3, 57:15
**choosing** [1] - 75:1
**circled** [2] - 43:11, 43:12
**Circuit** [9] - 5:21, 72:20, 77:14, 77:16, 77:18,

79:6, 79:7, 79:9, 79:15
**circumstances** [3] - 78:25, 79:2, 79:10
**cited** [3] - 72:20, 78:2, 78:3
**citizens** [2] - 74:15, 79:17
**city** [3] - 9:21, 44:21, 73:24
**City** [3] - 4:5, 9:6, 44:12
**claim** [1] - 73:19
**clarify** [1] - 44:25
**clear** [4] - 27:5, 80:1, 80:2, 80:20
**cleared** [2] - 20:22, 67:7
**clearly** [13] - 12:19, 16:15, 18:9, 26:10, 31:9, 34:24, 50:12, 73:22, 75:9, 75:15, 77:21, 79:11, 81:6
**clerk** [1] - 81:13
**CLERK** [9] - 3:11, 8:13, 8:17, 8:22, 8:25, 44:1, 44:6, 81:24, 82:4
**Clerk** [2] - 81:16, 81:20
**client** [3] - 71:23, 72:8, 72:10
**clint** [1] - 2:8
**Clinton** [1] - 1:16
**close** [4] - 50:9, 57:22, 61:1
**closed** [1] - 30:15
**closest** [1] - 38:15
**closing** [1] - 48:20
**clothed** [2] - 25:15, 26:1, 73:25
**clothes** [9] - 9:16, 22:7, 26:11, 31:10, 46:6, 58:1, 74:13, 75:1, 75:8
**clothing** [1] - 25:21, 75:9
**cobwebs** [1] - 55:5
**code** [1] - 33:25
**collarless** [1] - 77:1
**coming** [14] - 11:4, 11:5, 13:4, 13:11, 13:17, 27:16, 35:5, 35:6, 46:24, 47:4, 59:6, 60:15, 61:19, 62:17
**committed** [2] - 81:8
**common** [1] - 79:14
**communicating** [2] - 33:8, 39:25
**communication** [3] - 33:3, 60:8, 65:4
**community's** [1] - 79:20
**complaints** [2] - 6:9, 6:10
**complete** [1] - 83:8

**completes** [1] - 70:15
**complies** [6] - 27:19, 27:22, 28:4, 28:19, 28:21, 29:3
**computer** [1] - 60:24
**concept** [1] - 79:6
**concern** [1] - 36:8
**concerned** [1] - 38:19
**concludes** [1] - 70:12
**conclusion** [4] - 5:2, 5:12, 5:15, 82:20
**condition** [1] - 30:16
**conduct** [1] - 5:21
**conference** [3] - 5:4, 5:6, 5:8
**confronted** [1] - 75:1
**confused** [1] - 71:8
**confusing** [1] - 2:2
**confusion** [1] - 45:3
**conscious** [1] - 38:13
**consider** [1] - 7:1
**consistent** [1] - 80:8
**constitute** [1] - 83:6
**contact** [4] - 24:15, 24:25, 36:24, 39:24
**contends** [1] - 72:14
**content** [1] - 7:2
**contention** [3] - 71:11, 71:17, 77:4
**context** [2] - 72:8, 76:20
**continue** [1] - 16:4
**continued** [5] - 16:19, 47:12, 51:8, 51:14, 61:6
**contraband** [2] - 42:21, 54:21
**contrary** [1] - 6:24
**Control** [1] - 67:8
**control** [4] - 28:22, 37:10, 38:2, 78:23
**conundrum** [1] - 78:7
**conversation** [2] - 30:18, 33:16
**conviction** [2] - 5:16, 5:17
**coordinating** [1] - 82:14
**copies** [2] - 81:24, 82:1
**copy** [3] - 4:14, 23:24, 71:5
**core** [1] - 67:23
**corner** [5] - 20:16, 29:5, 36:7, 49:24, 50:1
**corners** [1] - 17:3
**correct** [66] - 2:22, 3:10, 3:19, 4:14, 4:16, 5:9, 5:10, 5:11, 10:8, 11:21, 12:23, 13:23, 14:8, 14:10, 22:16, 23:9, 24:24, 27:25, 28:11, 29:12, 29:15, 29:21,

29:23, 31:20, 32:3, 32:5, 32:9, 32:18, 33:13, 34:6, 34:9, 34:18, 35:13, 36:3, 36:12, 36:14, 36:23, 37:3, 37:6, 37:8, 38:21, 39:4, 43:1, 45:5, 45:6, 46:3, 47:23, 49:7, 49:25, 50:24, 52:19, 54:2, 54:24, 54:25, 59:3, 60:18, 62:9, 62:24, 63:17, 67:10, 70:2, 70:3, 70:20, 71:24, 72:9, 76:13

**correctly** [1] - 4:23

**counsel** [15] - 2:9, 2:20, 4:3, 4:12, 4:13, 4:25, 5:2, 7:12, 7:16, 10:16, 10:21, 46:15, 46:20, 80:12, 82:2

**counter** [1] - 47:2

**couple** [9] - 14:15, 19:17, 19:25, 37:9, 37:11, 37:12, 47:8, 56:4, 70:6

**course** [1] - 36:1

**COURT** [71] - 1:1, 2:2, 2:10, 2:16, 2:24, 3:3, 3:12, 3:19, 3:22, 4:2, 4:16, 4:18, 5:7, 5:12, 6:12, 7:6, 7:11, 7:24, 8:3, 8:12, 9:2, 10:20, 10:23, 21:5, 21:25, 23:17, 23:20, 23:25, 27:4, 27:8, 27:13, 41:17, 43:3, 43:14, 43:20, 44:10, 44:25, 45:4, 45:8, 46:17, 54:5, 55:21, 58:20, 59:23, 67:1, 69:11, 70:8, 70:14, 70:17, 70:19, 70:22, 70:25, 71:7, 71:14, 71:20, 72:2, 72:7, 72:13, 72:23, 73:2, 73:8, 74:22, 75:3, 76:2, 76:4, 76:12, 76:15, 82:1, 82:5, 82:9, 82:13

**Court** [23] - 3:15, 4:10, 5:20, 6:21, 16:17, 46:22, 49:9, 51:6, 51:13, 51:17, 52:24, 69:16, 77:17, 77:24, 77:25, 79:1, 79:5, 79:22, 79:23, 79:24, 82:13, 83:15

**court** [5] - 3:6, 77:6, 81:17, 81:21, 82:18

**Court's** [1] - 7:9

**court-appointed** [1] - 3:6

**Courthouse** [1] - 1:23

**courtroom** [4] - 2:3, 43:17, 70:23, 71:1

**credibility** [3] - 7:13, 7:22, 80:23

**credible** [1] - 80:13

**crime** [5] - 10:11, 45:14, 74:2, 79:19, 80:5

**criminal** [1] - 81:7

**Criminal** [2] - 2:7, 2:20

**CRIMINAL** [1] - 1:5

**criteria** [1] - 4:10

**criticism** [1] - 6:19

**cross** [4] - 7:16, 7:21, 35:10, 80:12

**CROSS** [2] - 22:2, 55:23

**cuff** [1] - 24:21

**cuffed** [3] - 28:22, 38:20, 64:16

**cuffs** [5] - 25:23, 38:22, 64:14

**curb** [4] - 47:17, 47:18, 47:19, 50:9

**curious** [1] - 6:9

**current** [2] - 9:7, 44:13

**custody** [1] - 78:23

**cut** [4] - 14:14, 50:1, 50:23

**cuts** [2] - 17:20, 17:21

## D

**daily** [1] - 67:21

**dance** [1] - 76:17

**dangerous** [1] - 74:24

**dark** [1] - 64:4

**dash** [1] - 69:5

**database** [1] - 42:7

**date** [1] - 45:1

**days** [2] - 47:8, 56:4

**dead** [2] - 17:17, 17:20

**Dease** [1] - 25:5

**debate** [1] - 73:14

**debris** [5] - 36:13, 36:14, 53:16, 54:12, 64:12

**decision** [1] - 5:22

**deemed** [1] - 23:20

**deep** [1] - 7:14

**defendant** [43] - 2:12, 7:12, 10:16, 10:19, 11:9, 27:21, 27:24, 29:7, 30:18, 31:17, 33:2, 38:20, 39:2, 41:25, 46:15, 46:18, 47:5, 47:6, 47:10, 48:6, 48:7, 48:21, 52:1, 52:2, 57:23, 58:13, 60:4, 60:19, 62:23, 63:13, 71:9, 71:10, 73:3, 73:5, 76:22, 76:24, 77:9, 78:7, 78:14, 80:1, 81:10, 81:19, 82:10

**Defendant** [2] - 1:7, 1:18

**Defendant's** [8] - 23:18, 23:21, 27:8, 56:7, 71:3, 71:7, 74:10, 76:23

**defendant's** [4] - 27:10, 77:1, 77:8, 81:11

**Defender** [1] - 2:15

**defense** [10] - 3:16, 4:12, 4:13, 4:24, 5:2, 7:16, 46:19, 70:17, 76:16, 80:12

**defer** [1] - 71:25

**deferred** [1] - 79:15

**definitely** [1] - 3:2

**degree** [2] - 52:5, 52:12

**demonstrate** [1] - 76:20

**demonstrated** [1] - 59:24

**denied** [4] - 77:17, 81:13, 81:14, 81:19

**denies** [1] - 77:19

**denying** [3] - 71:23, 72:8, 77:21

**department** [1] - 6:25

**Department** [2] - 4:6, 44:12

**depict** [1] - 64:8

**depicted** [1] - 38:25

**depth** [2] - 7:19, 7:20

**derivative** [2] - 3:14, 81:12

**describe** [5] - 11:3, 14:23, 25:17, 36:24, 46:22

**described** [4] - 14:21, 15:6, 19:1, 49:23

**description** [2] - 11:11, 11:18

**detail** [1] - 67:25

**detain** [3] - 24:18, 24:19, 24:21

**detained** [1] - 39:2

**Detective** [3] - 4:3, 24:25, 25:5

**detectives** [2] - 24:16, 24:25

**determination** [1] - 11:17

**Dickey** [4] - 79:8, 79:13, 79:14, 79:21

**Dickey-Bey** [4] - 79:8, 79:13, 79:14, 79:21

**different** [2] - 20:20, 25:9

**differently** [1] - 25:2

**difficulty** [1] - 76:6

**dig** [1] - 8:2

**dip** [1] - 31:21

**direct** [1] - 45:15

**DIRECT** [2] - 9:3, 44:7

**directed** [8] - 52:5, 52:18, 52:25, 53:13, 62:19, 64:24, 70:1, 70:5

**directing** [1] - 52:4, 53:1

**direction** [1] - 13:20

**directly** [3] - 8:18, 44:2, 47:22

**dirty** [4] - 36:14, 36:16, 54:16, 55:2

**disappeared** [1] - 27:6

**discard** [2] - 18:23, 21:18

**disclose** [1] - 4:20

**disclosed** [1] - 4:11

**discuss** [3] - 30:11, 43:15, 70:10

**discussed** [2] - 79:8, 80:7

**discussion** [2] - 77:15, 79:25

**Dispatch** [4] - 39:22, 39:25, 60:12, 60:16

**dispatcher** [1] - 60:10

**displayed** [3] - 12:20, 26:10, 31:9

**distance** [1] - 16:6

**distinguish** [1] - 75:14

**district** [2] - 66:19, 66:20

**District** [7] - 9:8, 22:5, 40:20, 44:14, 44:23, 66:21, 68:13

**DISTRICT** [2] - 1:1, 1:1

**Division** [2] - 4:23, 6:25

**DIVISION** [1] - 1:2

**division** [2] - 4:5, 68:15

**docket** [1] - 3:8

**done** [1] - 24:9

**door** [6] - 30:15, 30:16, 47:1, 57:17, 59:8, 59:12

**double** [1] - 82:16

**down** [47] - 8:18, 11:4, 11:5, 11:9, 13:11, 13:17, 15:14, 16:18, 16:19, 16:22, 17:11, 18:12, 30:20, 30:24, 31:12, 35:20, 35:21, 35:24, 37:1, 37:7, 38:4, 39:6, 42:5, 43:14, 47:4, 47:12, 49:11, 50:5, 50:8, 50:19, 52:22, 58:21, 59:6, 59:14, 60:25, 61:3, 61:4, 63:5, 63:6, 63:8, 63:10, 64:1, 70:9, 73:13, 75:5, 76:19, 80:7

**draw** [1] - 13:8, 27:5, 27:15, 27:18, 28:5, 28:12, 43:10, 49:2,

60:23, 60:24, 61:13

**drawn** [1] - 15:18

**dreadlocks** [2] - 74:19, 76:25

**drew** [1] - 61:21, 62:3

**drives** [2] - 26:25, 67:20

**driving** [10] - 26:23, 29:6, 46:9, 46:10, 57:11, 58:10, 58:12, 63:4, 68:22, 69:2

**drop** [2] - 65:17, 80:15

**dropped** [2] - 19:10, 65:15

**dropping** [1] - 81:2

**drove** [2] - 11:14, 60:24

**drug** [2] - 10:11, 45:13

**due** [1] - 45:14

**duty** [3] - 25:10, 25:13, 82:16

**dwell** [1] - 5:25

**dwelling** [2] - 12:7, 16:21

## E

**early** [2] - 45:7, 45:8

**easily** [1] - 70:4

**east** [3] - 13:23, 49:7, 50:23

**eastbound** [4] - 11:20, 14:13, 15:16, 48:22

**effort** [2] - 76:4, 76:17

**either** [7] - 40:23, 47:7, 61:17, 61:19, 62:2, 62:5, 69:5

**elapsed** [1] - 69:19

**elements** [1] - 55:7

**encounter** [6] - 10:13, 10:15, 10:25, 11:3, 46:14, 46:23

**encountered** [2] - 46:11, 57:1

**end** [6] - 16:20, 17:17, 17:21, 18:12, 28:14, 29:25, 33:23, 63:16

**ended** [3] - 50:4, 51:10, 56:23

**ends** [1] - 17:20

**enforcement** [1] - 79:16

**enforcing** [1] - 79:20

**enlarged** [1] - 27:12

**entered** [2] - 50:6, 51:15

**entire** [2] - 32:7, 37:14

**escorting** [1] - 41:7

**Esquire** [3] - 1:16, 1:18, 1:19

**essence** [1] - 72:21

**essentially** [6] - 72:4,

73:4, 73:25, 78:14, 78:22, 81:1
  **establishing** [1] - 4:10
  **event** [3] - 69:20, 70:11
  **events** [2] - 11:3, 46:23
  **eventually** [5] - 48:17, 48:21, 53:19, 61:20, 62:1
  **everywhere** [1] - 62:16
  **evidence** [18] - 3:8, 3:14, 3:23, 4:11, 41:3, 66:10, 66:12, 71:4, 71:15, 75:3, 75:6, 76:21, 80:2, 80:17, 80:20, 81:12, 81:18
  **Evidence** [2] - 55:18, 67:8
  **ex** [1] - 4:7
  **exact** [12] - 12:1, 20:1, 23:2, 23:3, 23:5, 29:8, 34:22, 36:6, 43:8, 56:10, 69:16, 69:21
  **exactly** [11] - 11:23, 20:17, 30:2, 32:12, 34:14, 34:16, 37:5, 40:7, 49:9, 58:17, 78:20
  **EXAMINATION** [6] - 9:3, 22:2, 43:4, 44:7, 55:23, 69:12
  **examination** [1] - 80:12
  **examine** [2] - 7:17, 7:21
  **Exhibit** [22] - 9:24, 17:2, 17:5, 18:19, 20:12, 21:7, 23:18, 23:21, 27:8, 27:10, 27:11, 36:9, 45:16, 52:7, 54:7, 56:7, 63:7, 71:3, 71:8, 71:9, 74:10, 76:23
  **exhibits** [2] - 81:21, 81:22
  **exited** [4] - 12:9, 12:11, 48:5, 51:15
  **exiting** [1] - 74:2
  **expectation** [1] - 78:4
  **experience** [1] - 79:16
  **experienced** [1] - 80:12
  **expertise** [1] - 79:16
  **explanation** [1] - 7:1
  **exposed** [1] - 55:7
  **expressly** [1] - 29:16
  **extended** [1] - 55:8
  **extent** [1] - 7:11
  **extra** [2] - 25:18, 68:3
  **extremely** [1] - 50:6
  **eyes** [2] - 36:4, 64:3

## F

  **F-A-B-I-E-N** [1] - 44:4
  **F.3d** [4] - 77:15, 77:18,

79:8, 79:22
  **Fabien** [3] - 4:6, 43:23, 44:4
  **FABIEN** [1] - 43:24
  **face** [1] - 57:6
  **faced** [1] - 78:8
  **facing** [3] - 17:9, 17:10, 34:17
  **fact** [10] - 7:9, 25:3, 71:12, 74:8, 75:2, 75:19, 77:6, 77:7, 77:8, 78:8
  **facts** [10] - 71:9, 71:22, 72:13, 73:12, 76:19, 78:5, 78:7, 80:5, 80:15, 81:2
  **factual** [3] - 72:5, 76:10, 78:6
  **fair** [4] - 10:4, 17:11, 45:24, 79:19
  **fairly** [5] - 19:2, 26:3, 26:5, 57:22, 70:5
  **fall** [3] - 4:8, 37:6, 39:9
  **familiar** [1] - 8:1
  **far** [8] - 12:14, 14:18, 18:11, 35:14, 52:15, 58:16, 68:5, 80:7
  **fast** [4] - 29:6, 58:12, 58:16, 70:5
  **father** [1] - 3:4
  **Federal** [1] - 2:15
  **feet** [8] - 12:16, 14:19, 16:8, 17:16, 18:13, 19:12, 35:17, 35:18
  **felt** [2] - 4:24, 37:9
  **female** [2] - 40:10, 65:12
  **fence** [7] - 16:20, 16:21, 35:20, 50:6, 61:25, 62:8
  **fences** [1] - 52:15
  **field** [1] - 80:18
  **fighting** [1] - 37:24
  **figured** [1] - 62:5
  **file** [2] - 24:1, 81:22
  **filed** [1] - 81:19
  **files** [12] - 4:4, 4:5, 4:19, 4:24, 5:1, 5:13, 5:14, 5:18, 6:18, 6:23, 8:1, 8:5
  **final** [1] - 69:25
  **finally** [1] - 75:23
  **findings** [1] - 7:10
  **fine** [5] - 8:3, 24:1, 70:24, 72:2, 82:1
  **fire** [1] - 55:9
  **firearm** [13] - 13:13, 28:18, 35:1, 35:2, 35:4, 39:3, 40:24, 54:13, 64:22, 65:25, 66:2, 73:13, 75:24
  **first** [23] - 3:7, 8:23, 11:15, 22:13, 22:19,

24:24, 27:20, 27:21, 29:7, 31:4, 36:24, 36:25, 40:14, 47:15, 48:10, 56:3, 57:7, 58:22, 59:10, 64:25, 66:20, 76:15, 80:1
  **five** [4] - 9:10, 18:13, 35:17, 35:18
  **flashlight** [30] - 14:25, 16:13, 18:4, 18:5, 18:7, 20:9, 26:12, 32:4, 32:6, 32:7, 32:15, 32:17, 32:19, 34:20, 34:21, 34:22, 34:23, 37:15, 37:17, 39:10, 39:14, 39:16, 39:17, 39:18, 53:4, 53:10, 61:20, 63:20, 63:22, 64:2
  **flashlights** [1] - 39:20
  **flat** [1] - 39:7
  **flee** [4] - 14:2, 14:3, 14:8, 75:1
  **fleeing** [1] - 73:19
  **flees** [1] - 78:18
  **Flex** [3] - 68:11, 68:12
  **flight** [2] - 78:21, 80:6
  **flooded** [1] - 65:6
  **fluid** [1] - 79:6
  **follow** [2] - 16:4, 51:1
  **followed** [4] - 28:12, 49:18, 60:7, 60:25
  **foot** [10] - 14:10, 15:11, 16:22, 32:2, 33:6, 38:6, 38:12, 49:16, 51:15, 60:11
  **FOR** [1] - 1:1
  **force** [1] - 24:22
  **foregoing** [1] - 83:6
  **forget** [1] - 4:2
  **forth** [3] - 72:5, 79:1, 81:14
  **forward** [1] - 3:6
  **Four** [1] - 21:7, 54:7
  **four** [2] - 22:6, 30:4
  **Fourth** [12] - 5:21, 72:20, 73:4, 77:14, 77:16, 77:18, 78:15, 78:18, 79:6, 79:7, 79:9, 79:15
  **frankly** [2] - 75:24, 80:20
  **Frederick** [1] - 1:12
  **free** [3] - 7:20, 7:21, 32:22
  **Friday** [2] - 1:10, 74:11
  **front** [9] - 3:9, 8:19, 31:23, 45:17, 47:14, 47:21, 59:1, 59:15, 73:22
  **FUCHS** [25] - 2:6, 3:21, 3:25, 4:17, 5:10, 7:8, 7:23, 8:10, 9:1, 9:4,

10:24, 43:5, 43:13, 43:22, 44:8, 45:2, 45:6, 45:10, 46:21, 69:13, 70:15, 71:13, 76:9, 76:13, 82:8
  **Fuchs** [21] - 1:16, 2:5, 2:8, 2:10, 3:19, 4:16, 4:18, 5:12, 6:3, 7:7, 8:12, 21:25, 27:2, 43:3, 43:14, 43:21, 44:25, 55:21, 69:11, 76:8, 82:7
  **full** [2] - 20:22
  **fully** [1] - 53:14
  **fundamental** [1] - 75:24
  **furnished** [1] - 56:5
  **furthermore** [3] - 78:2, 80:4, 80:9

## G

  **gained** [1] - 35:21
  **gaining** [1] - 35:18
  **gates** [3] - 79:1, 79:5, 79:12
  **general** [14] - 18:22, 19:9, 25:18, 30:3, 30:24, 32:11, 43:9, 43:10, 53:1, 53:8, 69:17, 70:1, 76:20, 78:25
  **gentleman** [1] - 29:19
  **Giglio** [5] - 4:9, 4:21, 5:22, 6:19, 6:22
  **given** [5] - 4:24, 6:8, 56:17, 73:25, 74:5
  **glad** [2] - 2:25, 71:21
  **glass** [1] - 36:14
  **gloves** [1] - 55:14
  **Government** [2] - 1:16, 36:9
  **government** [17] - 3:22, 3:25, 4:13, 5:14, 6:14, 6:17, 6:20, 8:10, 43:22, 72:4, 72:14, 72:20, 76:14, 78:2, 78:3, 78:17, 82:6
  **Government's** [11] - 9:24, 17:1, 17:4, 18:19, 20:12, 21:6, 27:11, 45:16, 52:7, 54:7, 63:7
  **GOVERNMENT'S** [2] - 8:15, 43:24
  **government's** [3] - 70:15, 73:12, 74:9
  **grab** [1] - 13:15
  **grabbed** [4] - 37:4, 37:5, 48:21
  **grabbing** [3] - 13:12, 15:23, 31:22
  **grass** [3] - 14:14, 15:6,

15:8
  **gray** [1] - 10:17
  **great** [2] - 7:19, 73:10
  **green** [1] - 49:24
  **ground** [11] - 18:18, 19:4, 19:13, 34:18, 35:7, 37:7, 53:11, 53:15, 53:17, 54:15, 73:24
  **grown** [1] - 64:11
  **growth** [1] - 64:12
  **guard** [1] - 61:22
  **guarding** [1] - 64:19
  **guess** [2] - 40:6, 72:13
  **guilty** [2] - 5:16, 72:5
  **gun** [46] - 13:13, 18:17, 19:9, 21:12, 21:14, 21:18, 25:18, 25:23, 25:24, 26:8, 31:13, 32:22, 32:23, 35:15, 36:2, 37:13, 37:14, 39:9, 39:13, 41:5, 52:3, 52:8, 54:23, 55:6, 62:19, 63:18, 64:17, 66:7, 66:14, 67:7, 70:1, 70:4, 71:23, 72:9, 72:15, 75:22, 77:10, 77:21, 78:5, 80:3, 80:16, 80:17, 80:18, 81:2
  **guns** [2] - 42:20, 54:19
  **guy** [4] - 29:14, 57:10, 57:11, 57:14
  **guys** [2] - 29:6, 30:8

## H

  **H-U-T-E-R** [1] - 8:23
  **hair** [1] - 76:24
  **hallway** [2] - 43:17, 70:9
  **hand** [18] - 2:25, 8:14, 15:2, 15:23, 16:13, 18:16, 22:21, 22:23, 25:8, 26:14, 26:15, 32:20, 32:22, 32:25, 35:6, 35:8, 35:9, 48:14
  **handcuffing** [1] - 38:4
  **handcuffs** [6] - 19:18, 25:18, 25:24, 39:4, 51:21, 78:23
  **handed** [1] - 32:21
  **handgun** [11] - 18:23, 19:3, 19:10, 20:8, 20:10, 20:15, 21:10, 21:19, 35:6, 39:11, 39:23
  **handled** [1] - 25:9
  **hands** [4] - 13:6, 14:4, 41:5, 49:4
  **handwritten** [1] - 41:23
  **hard** [2] - 18:16, 71:5

**Hayden** [2] - 2:9, 2:11
**head** [1] - 56:2
**heading** [7] - 11:6, 11:20, 13:20, 14:13, 16:23, 50:23, 58:15
**hear** [9] - 19:4, 30:18, 30:22, 33:14, 33:24, 48:9, 57:21, 61:17, 71:21
**heard** [6] - 48:10, 61:17, 62:1, 62:5, 74:8, 76:8
**Hearing** [1] - 1:10
**hearing** [13] - 2:8, 3:24, 5:3, 5:13, 7:10, 7:18, 8:1, 43:16, 70:12, 71:4, 72:4, 72:8, 73:12
**heartily** [1] - 76:19
**held** [1] - 79:5
**Heller** [2] - 75:23, 76:1
**help** [2] - 64:14, 74:23
**hereby** [1] - 83:3
**hereunto** [1] - 83:9
**high** [4] - 10:11, 29:20, 74:2, 80:5
**himself** [2] - 75:8, 76:11
**hip** [2] - 31:11, 75:5
**hips** [1] - 25:24
**hit** [3] - 17:2, 19:4, 51:8
**Hodari** [10] - 72:21, 72:23, 72:24, 73:2, 73:16, 73:21, 74:12, 75:19, 78:13, 78:14
**Hold** [1] - 4:2
**hold** [1] - 51:5
**holding** [4] - 32:19, 33:20, 48:13, 50:20
**holster** [4] - 26:9, 26:13, 35:2, 37:14
**home** [3] - 47:14, 47:21, 50:6
**homes** [3] - 16:20, 30:3, 50:4
**honest** [1] - 74:18
**honestly** [1] - 68:25
**Honor** [56] - 2:6, 2:13, 2:22, 3:2, 3:25, 4:17, 5:5, 5:10, 5:24, 6:8, 7:8, 7:25, 8:10, 9:1, 10:18, 21:4, 21:24, 22:4, 23:19, 23:23, 27:3, 27:11, 41:16, 43:2, 43:6, 43:19, 43:22, 44:9, 45:2, 45:6, 46:16, 54:4, 55:20, 58:19, 66:25, 69:7, 69:10, 69:14, 70:7, 70:15, 70:18, 70:21, 70:24, 71:5, 71:13, 71:19, 71:25, 72:19, 73:16, 74:7, 75:23, 76:9, 76:13, 76:14, 82:8, 82:12
**Honor's** [2] - 8:1, 72:11

**Honorable** [1] - 1:12
**hour** [2] - 41:20, 41:22
**hours** [2] - 45:8, 77:10
**house** [8] - 23:12, 23:13, 23:15, 24:14, 29:24, 29:25, 30:2, 59:1
**houses** [4] - 30:4, 47:12, 58:18, 59:9
**huge** [1] - 50:16
**hum** [1] - 28:25
**HURSON** [11] - 2:22, 3:2, 72:3, 72:10, 72:17, 72:25, 73:6, 73:10, 74:24, 75:5, 76:3
**Hurson** [12] - 1:19, 2:14, 2:17, 2:19, 7:21, 72:1, 72:2, 73:9, 75:4, 76:4, 78:12, 82:11
**Hurson's** [1] - 3:4
**Huter** [60] - 4:1, 4:6, 4:21, 8:11, 8:21, 8:23, 9:5, 9:23, 10:18, 10:25, 43:6, 43:15, 46:8, 48:5, 48:16, 48:20, 49:2, 49:4, 49:11, 49:15, 51:18, 51:19, 51:20, 51:21, 51:23, 52:2, 52:18, 53:13, 57:16, 59:5, 59:13, 59:18, 60:3, 60:14, 60:20, 61:17, 61:20, 62:23, 63:12, 64:14, 64:20, 64:21, 66:6, 66:17, 67:9, 68:2, 70:1, 70:11, 70:22, 71:1, 76:10, 78:22, 80:10, 80:11, 80:14, 80:21, 80:25, 81:3, 81:4
**HUTER** [1] - 8:15
**Huter's** [2] - 74:17, 75:21

**I**

**ice** [4] - 75:13, 75:17, 76:5, 76:7
**idea** [1] - 74:13
**identifiable** [1] - 12:17
**identified** [5] - 10:18, 13:16, 46:18, 58:19, 76:10
**identify** [4] - 24:23, 31:4, 31:8, 75:8
**identifying** [1] - 23:8
**identity** [1] - 42:3
**Illinois** [3] - 79:1, 79:5, 79:12
**illuminate** [4] - 32:12, 34:18, 53:11, 64:5
**illuminated** [5] - 17:22,

18:1, 20:9, 53:9, 64:3
**illuminating** [1] - 32:15
**illumination** [3] - 14:23, 39:14, 50:14
**immediately** [3] - 17:24, 60:7, 74:4
**impeach** [1] - 4:11
**IN** [1] - 1:1
**incidences** [1] - 22:22
**incident** [6] - 25:12, 36:10, 39:5, 42:17, 45:1, 50:16
**incidents** [1] - 6:3
**including** [1] - 70:10
**indeed** [1] - 79:13
**indicate** [1] - 18:20
**indicated** [4] - 4:19, 16:23, 21:11, 43:7
**indicating** [3] - 27:17, 59:19, 81:13
**indicating)** [7] - 11:25, 13:22, 18:21, 21:1, 29:1, 47:9, 49:13
**indication** [1] - 55:6
**indicia** [1] - 80:14
**indictment** [1] - 45:4
**individual** [7] - 24:15, 30:9, 57:2, 72:14, 74:13, 75:25, 80:16
**individuals** [3] - 74:2, 74:3, 75:1
**information** [7] - 4:20, 4:22, 4:24, 4:25, 23:8, 56:12
**inoperability** [1] - 2:3
**inquiry** [2] - 6:15, 7:14
**inside** [2] - 18:2, 69:6
**intent** [1] - 7:9
**interact** [1] - 13:5
**interacted** [1] - 64:25
**interferences** [1] - 79:18
**Internal** [2] - 4:23, 6:24
**internal** [2] - 4:4, 4:5
**Investigation** [1] - 4:23
**investigation** [2] - 4:4, 4:5
**involve** [1] - 6:6
**involved** [2] - 6:11, 71:20
**issue** [3] - 5:24, 72:16, 76:10
**issues** [3] - 6:4, 7:13, 8:6
**item** [2] - 71:3, 71:15
**items** [1] - 6:2
**itself** [1] - 17:22

**J**

**jackets** [1] - 73:22
**JFM-09-0560** [1] - 1:6
**John** [1] - 2:9
**Jones** [8] - 22:17, 23:22, 24:3, 25:3, 71:12, 71:18, 76:22, 77:4
**Judge** [5] - 1:12, 79:4, 79:6, 79:13, 79:21
**judge** [1] - 82:16
**July** [13] - 5:8, 5:9, 9:11, 21:17, 44:17, 45:1, 45:2, 45:4, 45:7, 45:9, 57:7, 77:10
**jumped** [1] - 37:2
**jumping** [2] - 48:13, 48:15
**jury** [1] - 7:18
**Justice** [1] - 2:20

**K**

**Katherine** [1] - 1:18
**katherine** [1] - 2:14
**keep** [3] - 5:14, 30:21, 32:22
**Kentucky** [1] - 77:24
**kept** [7] - 13:3, 13:12, 13:17, 15:23, 25:23, 52:22
**Kevin** [2] - 81:19, 83:5
**KEVIN** [1] - 1:16
**kind** [5] - 10:10, 13:13, 45:11, 47:20, 57:14
**knives** [1] - 42:20
**known** [1] - 45:13

**L**

**L-A-R-O-N-D-E** [1] - 44:5
**label** [5] - 28:17, 28:20, 58:21, 58:24
**lamp** [1] - 34:10
**lamps** [1] - 50:15
**land** [1] - 35:7
**landed** [3] - 19:6, 36:2, 36:5
**lane** [1] - 59:2
**LARONDE** [1] - 43:24
**Laronde** [56] - 4:7, 4:22, 7:13, 7:17, 9:20, 11:16, 11:19, 15:10, 15:13, 19:19, 19:24, 20:4, 20:25, 21:15, 21:17, 22:9, 26:23, 26:25, 27:16, 27:21, 27:23,

29:6, 29:11, 30:8, 30:17, 30:25, 33:3, 33:18, 37:20, 38:2, 38:3, 38:24, 39:3, 39:8, 39:13, 39:16, 40:23, 41:5, 41:9, 43:23, 44:4, 44:5, 44:11, 45:11, 45:15, 46:22, 54:6, 69:14, 70:8, 70:23, 70:25, 74:8, 74:18, 80:24, 81:1, 81:3
**Laronde's** [2] - 28:23, 40:19
**last** [2] - 30:3, 30:4
**late** [1] - 45:3
**Laurence** [7] - 22:17, 23:22, 24:3, 25:3, 71:12, 71:17, 76:22
**law** [5] - 74:14, 75:16, 76:17, 79:16, 79:20
**Lawrence** [1] - 77:4
**lawyer** [1] - 73:10
**laying** [3] - 37:18, 39:6, 39:7
**leading** [2] - 11:3, 46:23
**learn** [3] - 22:13, 22:19, 56:3
**least** [1] - 6:5
**leave** [3] - 30:14, 47:3, 57:17
**leaves** [1] - 53:16
**leeway** [1] - 79:20
**left** [6] - 10:20, 32:20, 32:21, 35:12, 46:19, 57:18
**legal** [2] - 70:19, 76:6
**length** [1] - 76:24
**less** [4] - 53:23, 60:5, 64:21, 64:23
**letter** [5] - 4:3, 4:14, 4:19, 6:3, 58:22
**Lewis** [2] - 7:10, 10:16, 10:19, 42:1, 42:9, 42:23, 42:24, 46:15, 46:18, 81:19, 83:4
**LEWIS** [1] - 1:6
**lieutenant** [1] - 56:19
**light** [3] - 34:20, 62:3, 62:5
**lights** [16] - 14:24, 16:11, 17:24, 18:1, 34:2, 34:5, 34:14, 34:15, 39:15, 63:4, 64:5, 69:1, 69:2, 69:4, 69:5, 69:16
**likely** [1] - 72:17
**likeness** [3] - 71:9, 71:15, 76:23
**limit** [1] - 29:8
**line** [2] - 34:11, 34:12
**lines** [1] - 48:10
**listed** [1] - 77:13

**listen** [1] - 61:17
**listening** [1] - 61:15
**lit** [2] - 14:24, 50:15
**literally** [1] - 78:21
**loaded** [1] - 53:14
**local** [1] - 6:25
**location** [7] - 5:15, 19:21, 43:7, 43:9, 52:18, 69:16, 70:1
**locations** [1] - 69:15
**logistics** [1] - 2:4
**Lombard** [1] - 1:23
**look** [15] - 3:6, 3:12, 19:1, 20:17, 21:18, 23:7, 29:13, 34:10, 34:11, 52:14, 53:11, 53:19, 64:17, 76:21, 76:22
**looked** [8] - 8:2, 24:5, 36:7, 47:6, 52:14, 56:23, 64:9, 64:24
**looking** [17] - 11:10, 22:14, 23:15, 29:14, 29:16, 37:22, 37:25, 47:6, 52:9, 52:10, 52:13, 56:1, 56:21, 56:22, 60:14, 69:2, 71:7
**lookout** [4] - 22:21, 22:25, 29:18
**looks** [1] - 11:21, 34:11, 77:2
**loop** [1] - 33:11
**lose** [3] - 14:20, 16:9, 36:17
**loses** [1] - 77:22
**lower** [1] - 27:2
**LUCAS** [1] - 1:6
**Lucas** [75] - 2:7, 2:15, 2:16, 5:18, 10:16, 10:19, 10:25, 11:11, 11:15, 12:4, 12:14, 12:21, 13:2, 13:6, 15:9, 15:14, 16:6, 16:15, 17:11, 18:9, 18:11, 19:23, 21:18, 21:20, 28:13, 35:3, 36:4, 36:19, 38:1, 40:18, 41:7, 42:1, 42:10, 42:23, 42:24, 46:15, 46:18, 46:23, 47:1, 47:14, 47:15, 47:22, 48:2, 48:4, 48:13, 49:1, 49:4, 49:7, 50:7, 50:12, 50:18, 51:7, 51:8, 51:20, 59:4, 59:6, 64:15, 64:18, 66:3, 66:5, 66:18, 71:10, 71:12, 71:17, 72:15, 74:10, 75:18, 77:5, 77:20, 78:8, 80:5, 80:14, 81:2, 81:19, 83:5
**Lucas's** [2] - 16:17, 49:23

**luminous** [1] - 34:21
**lunged** [1] - 36:25

# M

**ma'am** [7] - 25:11, 25:14, 25:16, 26:24, 30:5, 30:7, 57:9
**Madam** [2] - 81:15, 81:20
**magazine** [1] - 25:19
**mailboxes** [1] - 56:19
**main** [1] - 36:7
**maintain** [1] - 60:19
**maintained** [1] - 72:6
**man** [1] - 73:13
**manner** [1] - 83:8
**manufacturing** [2] - 80:15, 81:1
**map** [15] - 11:2, 11:23, 13:21, 14:12, 15:7, 16:23, 17:3, 19:11, 43:7, 46:23, 49:9, 51:5, 51:17, 52:9, 69:15
**mark** [3] - 28:5, 47:3
**marked** [14] - 9:17, 9:24, 17:1, 17:4, 20:11, 21:6, 23:17, 24:2, 45:16, 52:6, 54:6, 56:7, 69:14, 73:23
**market** [2] - 10:11, 45:13
**Mary** [3] - 1:22, 83:3, 83:14
**MARYLAND** [1] - 1:1
**Maryland** [2] - 1:11, 1:24
**matched** [2] - 11:11, 11:17
**material** [4] - 4:8, 5:22, 6:19, 6:22
**materials** [1] - 6:21
**matter** [14] - 2:7, 7:2, 7:3, 7:25, 33:24, 77:6, 78:6, 79:3, 79:4, 82:7, 82:10, 83:4, 83:8
**McDonald** [1] - 77:17
**mean** [27] - 15:25, 19:9, 23:11, 25:7, 29:18, 30:13, 30:23, 33:25, 34:1, 34:13, 34:22, 41:10, 43:11, 48:15, 50:15, 53:19, 57:22, 64:3, 64:4, 65:17, 65:20, 67:6, 69:4, 74:9, 75:2, 75:10, 78:6
**means** [5] - 23:13, 23:14, 24:21, 40:21, 41:6
**meant** [1] - 42:16

**median** [3] - 11:7, 11:13, 47:13
**median's** [1] - 28:2
**meet** [1] - 31:23
**member** [1] - 2:19
**memo** [1] - 6:13
**mention** [1] - 5:25
**mentioned** [1] - 22:14
**met** [2] - 38:24, 49:11
**microphone** [2] - 8:18, 44:2
**middle** [3] - 11:8, 11:14, 47:20
**midnight** [2] - 65:13
**might** [4] - 4:8, 36:19, 71:16, 77:22
**minute** [6] - 41:16, 48:11, 53:23, 64:22, 64:23, 71:16
**minutes** [5] - 19:17, 19:25, 37:9, 37:11, 37:12
**missed** [1] - 71:16
**mix** [1] - 74:18
**mix-up** [1] - 74:18
**model** [3] - 26:18, 58:9, 68:21
**moment** [1] - 66:25
**months** [1] - 68:19
**mood** [1] - 74:12
**morning** [3] - 45:7, 45:8, 48:1
**most** [1] - 72:17
**motion** [8] - 3:7, 3:13, 3:14, 3:16, 77:8, 81:11, 81:14, 81:18
**motions** [2] - 2:8, 3:24
**Motions** [1] - 1:10
**Motz** [1] - 1:12
**move** [2] - 51:5, 53:20
**moved** [2] - 5:6, 68:18
**moving** [2] - 82:14, 82:16
**MR** [36] - 2:6, 2:22, 3:2, 3:21, 3:25, 4:17, 5:10, 7:8, 7:23, 8:10, 9:1, 9:4, 10:24, 43:5, 43:13, 43:22, 44:8, 45:2, 45:6, 45:10, 46:21, 69:13, 70:15, 71:13, 72:3, 72:10, 72:17, 72:25, 73:6, 73:10, 74:24, 75:5, 76:3, 76:9, 76:13, 82:8
**MS** [25] - 2:13, 3:18, 4:15, 5:5, 5:11, 5:24, 7:5, 7:25, 22:3, 23:19, 23:23, 24:4, 27:10, 27:14, 41:19, 55:24, 67:3, 70:18, 70:21, 70:24, 71:5, 71:19, 71:25, 82:12

**must** [1] - 4:11
**mustache** [1] - 76:25

# N

**name** [12] - 4:22, 8:19, 8:20, 8:22, 8:23, 22:17, 42:2, 42:6, 42:24, 44:3, 55:25
**narrow** [2] - 50:6, 50:25, 52:15
**nature** [1] - 6:6
**NCIC** [1] - 42:4
**neck** [1] - 58:2
**need** [7] - 2:23, 2:24, 8:4, 23:25, 32:11, 43:17, 82:3
**needed** [1] - 53:10
**needs** [1] - 65:18
**negatively** [1] - 33:1
**neighborhood** [3] - 10:10, 45:11, 74:25
**never** [3] - 6:23, 37:14, 61:24
**new** [1] - 2:19
**Newberger** [15] - 1:18, 2:14, 2:17, 3:17, 4:14, 5:23, 6:13, 7:20, 22:1, 23:17, 27:9, 55:22, 71:21, 72:17, 82:10
**NEWBERGER** [25] - 2:13, 3:18, 4:15, 5:5, 5:11, 5:24, 7:5, 7:25, 22:3, 23:19, 23:23, 24:4, 27:10, 27:14, 41:19, 55:24, 67:3, 69:9, 70:18, 70:21, 70:24, 71:5, 71:19, 71:25, 82:12
**next** [9] - 9:25, 13:10, 13:25, 29:25, 31:13, 37:18, 43:20, 48:12, 50:11
**nice** [3] - 2:10, 2:18, 82:19
**Nice** [2] - 2:11, 2:16
**Niemeyer** [4] - 79:4, 79:7, 79:13, 79:21
**night** [16] - 21:13, 25:2, 25:17, 26:23, 29:17, 44:20, 46:5, 54:8, 56:1, 56:21, 57:12, 57:25, 65:14, 67:25, 68:4, 74:20
**nighttime** [1] - 64:10
**NO** [1] - 1:5
**none** [2] - 26:21, 26:22
**normal** [3] - 6:16, 30:21, 30:23
**NORTHERN** [1] - 1:2
**note** [2] - 80:9, 81:6

**noted** [5] - 4:4, 78:13, 78:17, 79:14, 79:15
**notes** [1] - 41:23
**nothing** [2] - 42:20, 54:23
**notice** [5] - 15:22, 50:18, 55:1, 55:4, 57:7
**noticed** [9] - 27:21, 29:7, 29:11, 29:22, 36:7, 38:11, 57:3, 58:13
**notices** [1] - 27:23
**number** [4] - 3:9, 7:3, 21:13, 72:20
**Number** [15] - 2:7, 3:9, 3:13, 3:15, 9:24, 17:2, 17:5, 18:19, 20:12, 21:7, 45:16, 52:7, 54:7, 81:12, 81:19
**Number(s** [1] - 83:5
**numbers** [1] - 6:5
**numerous** [1] - 50:15

# O

**object** [4] - 18:17, 18:25, 19:2, 35:6
**objects** [1] - 53:11
**observation** [1] - 77:6
**observations** [1] - 80:10
**observe** [2] - 80:11
**observed** [8] - 47:1, 47:5, 47:10, 48:13, 51:15, 80:21, 80:25
**obvious** [1] - 26:5
**obviously** [2] - 72:10, 82:3
**occurred** [7] - 25:12, 36:10, 43:8, 50:7, 69:15, 69:16, 78:20
**occurring** [1] - 68:7
**OF** [2] - 1:1, 1:4
**offense** [1] - 81:7
**Office** [1] - 2:14
**OFFICER** [2] - 8:15, 43:24
**Officer** [95] - 4:1, 4:21, 4:22, 7:12, 7:17, 8:11, 10:18, 10:25, 15:10, 15:13, 19:19, 19:23, 20:4, 20:25, 21:14, 21:17, 22:9, 26:22, 26:25, 27:16, 27:21, 27:23, 28:23, 29:6, 29:11, 30:8, 30:17, 30:25, 33:3, 33:18, 37:20, 38:2, 38:3, 38:24, 39:3, 39:8, 39:13, 39:16, 40:18, 40:23, 41:5, 41:8,

43:22, 44:11, 45:11,
45:15, 46:22, 48:16,
48:20, 49:2, 49:4, 49:11,
49:15, 51:18, 51:19,
51:20, 51:21, 51:23,
52:18, 53:13, 54:6,
57:16, 59:13, 59:18,
60:3, 60:20, 62:23,
63:12, 64:14, 64:20,
66:17, 67:9, 68:1, 70:1,
70:8, 70:10, 70:22,
70:25, 74:8, 74:17,
74:18, 75:21, 76:10,
78:22, 80:9, 80:11,
80:14, 80:21, 80:24,
80:25, 81:1, 81:3, 81:4
  **officer** [30] - 8:21, 9:5,
9:9, 9:20, 9:23, 11:16,
11:19, 12:18, 12:21,
22:7, 26:6, 31:8, 33:14,
40:10, 43:6, 43:15, 44:4,
44:15, 46:8, 48:5, 64:21,
65:18, 66:7, 69:14,
70:25, 73:1, 74:23, 75:4,
75:21, 76:11
  **officer's** [1] - 78:19
  **officers** [25] - 40:1,
40:5, 40:14, 40:19,
55:12, 62:21, 65:1, 65:7,
65:12, 65:16, 65:19,
65:22, 66:9, 66:18,
73:21, 73:23, 73:25,
74:1, 74:5, 74:12, 74:15,
75:15, 75:16, 79:16, 80:4
  **Officers** [1] - 4:6
  **official** [1] - 83:7
  **Official** [1] - 83:15
  **old** [1] - 80:18
  **older** [1] - 3:4
  **on-the-ground** [1] -
73:24
  **once** [6] - 38:1, 38:11,
51:8, 59:18, 60:21, 65:20
  **One** [12] - 9:24, 18:19,
23:18, 23:21, 27:12,
45:16, 56:8, 71:3, 71:8,
71:9, 74:10, 76:23
  **one** [24] - 4:3, 5:24,
17:2, 23:5, 23:25, 26:25,
27:23, 30:4, 39:21,
41:16, 47:11, 51:5, 59:8,
59:19, 59:20, 61:1,
67:20, 68:2, 68:20, 71:2,
74:25, 76:5
  **ongoing** [1] - 56:20
  **open** [9] - 10:11, 30:15,
30:21, 45:13, 57:17,
57:18, 57:19, 57:20,
81:17
  **Operations** [8] - 9:8,

44:14, 68:4, 68:11,
68:16, 68:17, 68:18,
68:19
  **opinion** [9] - 4:10,
77:14, 77:16, 77:18,
77:25, 79:9, 79:14, 79:21
  **opportunity** [4] - 6:14,
7:16, 80:10, 80:11
  **opposite** [1] - 47:22
  **order** [3] - 81:13, 81:15,
81:20
  **ordered** [1] - 81:18
  **orders** [1] - 30:24
  **original** [1] - 81:22
  **originally** [2] - 52:1,
59:8
  **originals** [2] - 81:23,
82:2
  **otherwise** [1] - 77:22
  **outside** [4] - 26:10,
30:19, 43:16, 70:9
  **overgrown** [3] - 20:23,
52:16, 52:17
  **overgrowth** [2] - 36:11,
36:14
  **overrule** [1] - 74:12
  **own** [4] - 5:21, 38:20,
39:16, 41:15
  **ownership** [4] - 71:23,
72:8, 77:20, 77:21

## P

  **P-A-T-R-I-C-K** [1] - 8:24
  **p.m** [3] - 2:1, 25:10,
82:20
  **pages** [1] - 83:6
  **Pages** [1] - 77:15
  **panel** [1] - 2:20
  **pants** [1] - 31:23
  **paper** [1] - 3:9
  **Paper** [5] - 3:9, 3:13,
3:15, 81:12, 81:19
  **parallel** [2] - 15:15,
16:24, 50:7
  **paralleled** [1] - 51:9
  **pardon** [1] - 34:4
  **parked** [1] - 62:25
  **parking** [7] - 17:25,
39:25, 51:10, 61:6, 61:7,
61:8, 61:23
  **part** [4] - 5:18, 5:20,
24:2, 81:21
  **parte** [1] - 4:8
  **partial** [1] - 76:25
  **particular** [2] - 52:18,
67:25
  **particularly** [1] - 55:1
  **partner** [4] - 22:9, 60:7,

60:10, 69:24
  **partnered** [1] - 67:23
  **partners** [3] - 22:11,
67:11, 67:22
  **partnership** [1] - 67:13
  **passed** [2] - 23:2, 24:6,
60:3
  **pat** [1] - 42:14
  **path** [1] - 16:22
  **PATRICK** [1] - 8:15
  **Patrick** [5] - 4:1, 4:6,
8:11, 8:21, 8:23
  **patrol** [7] - 11:6, 30:21,
40:14, 58:15, 63:1,
68:17, 68:18
  **Patrol** [1] - 40:13
  **patrolling** [6] - 9:21,
10:7, 10:12, 44:21,
45:12, 46:3
  **pattern** [1] - 6:16
  **pause** [3] - 41:18, 67:2,
69:8
  **pending** [4] - 3:7, 3:13,
3:15, 3:16
  **people** [6] - 43:7, 60:14,
65:3, 65:4, 67:21, 76:19
  **period** [2] - 55:8, 80:18
  **permission** [4] - 9:1,
21:4, 44:9, 54:4
  **permitted** [2] - 78:24,
79:12
  **person** [15] - 11:18,
13:17, 16:1, 22:19,
23:12, 24:24, 25:3,
38:22, 42:18, 47:15,
57:7, 59:24, 74:23,
78:17, 80:8
  **person's** [1] - 22:17
  **personal** [1] - 6:18
  **personally** [1] - 6:21
  **phone** [1] - 33:7
  **phonetic** [1] - 40:8
  **photo** [1] - 24:3
  **photograph** [8] - 23:8,
23:21, 24:7, 24:8, 56:8,
56:11, 64:8, 77:2
  **photographs** [3] - 27:7,
40:24, 66:15
  **photos** [2] - 75:6, 75:7
  **physically** [1] - 35:3
  **pick** [1] - 41:5
  **picked** [5] - 39:10, 41:6,
54:2, 55:1, 55:6
  **picture** [12] - 10:3,
20:17, 20:24, 42:8, 42:9,
52:14, 56:5, 56:6, 56:22,
57:4, 57:5, 76:22
  **pictures** [1] - 67:7
  **pitch** [1] - 64:7
  **place** [5] - 39:5, 51:21,

51:22, 75:12, 78:23
  **plain** [13] - 9:16, 22:7,
25:15, 26:1, 26:11,
31:10, 46:6, 53:18, 58:1,
73:25, 74:13, 75:1, 75:8
  **plan** [2] - 8:2, 30:9
  **plea** [2] - 5:17, 72:6
  **pleaded** [1] - 72:5
  **pocket** [1] - 26:7
  **point** [63] - 3:16, 3:19,
11:23, 12:14, 12:25,
13:6, 13:8, 14:3, 14:6,
14:14, 14:16, 14:20,
15:18, 16:7, 18:11,
18:12, 19:14, 19:19,
21:20, 28:5, 28:10,
28:17, 31:16, 32:6,
32:23, 34:13, 34:19,
35:14, 35:15, 35:19,
36:9, 37:13, 37:17,
37:21, 38:13, 39:22,
40:1, 49:5, 50:5, 50:23,
51:3, 51:11, 51:20,
51:23, 58:8, 58:13,
58:21, 59:4, 59:13, 60:6,
61:1, 61:8, 62:15, 63:6,
63:12, 66:5, 72:7, 73:11,
75:17, 75:18, 76:9, 82:6,
82:10
  **pointed** [2] - 32:13,
39:10
  **police** [22] - 6:25, 9:9,
12:18, 12:20, 12:21,
26:5, 31:8, 31:9, 44:15,
73:18, 73:23, 73:25,
74:15, 74:20, 74:22,
75:4, 75:11, 76:11,
78:15, 78:18, 78:19, 80:4
  **Police** [4] - 4:6, 9:6,
44:12, 56:11
  **policy** [1] - 76:16
  **porch** [9] - 12:12,
13:12, 29:22, 30:6, 47:5,
47:10, 49:12, 59:6, 59:11
  **porches** [1] - 47:11
  **position** [2] - 73:16,
76:6
  **possess** [1] - 75:23
  **possible** [1] - 33:18
  **Post** [2] - 9:22, 44:22
  **post** [1] - 76:1
  **potential** [2] - 6:19,
6:22
  **powerful** [1] - 34:22
  **practice** [2] - 30:21,
30:23
  **pragmatic** [1] - 79:14
  **precinct** [1] - 66:18
  **Precinct** [1] - 42:23
  **prepare** [1] - 81:13

  **present** [1] - 3:23
  **presentation** [1] - 70:16
  **press** [2] - 33:22, 47:2
  **pressing** [1] - 33:20
  **pretrial** [3] - 5:3, 5:5,
5:7
  **pretty** [3] - 29:19,
35:18, 36:16
  **previously** [2] - 9:23,
20:11, 52:6
  **principle** [2] - 73:17,
79:8
  **principles** [1] - 79:5
  **Pringle** [1] - 79:22
  **prints** [2] - 42:5, 42:6
  **priority** [1] - 29:20
  **privacy** [2] - 78:4, 79:18
  **probable** [6] - 75:25,
79:6, 80:4, 81:5, 81:6,
81:9
  **procedure** [1] - 6:20
  **proceed** [5] - 3:24, 8:9,
9:1, 44:9, 75:11
  **Proceedings** [5] - 2:1,
41:18, 67:2, 69:8, 82:20
  **proceedings** [2] - 83:4,
83:7
  **process** [1] - 73:19
  **processed** [2] - 67:7,
67:10
  **pronouncing** [1] - 4:22
  **proof** [1] - 3:23
  **proper** [1] - 79:17
  **property** [5] - 54:10,
77:11, 77:20, 77:21, 78:9
  **proposition** [1] - 78:4
  **protect** [1] - 79:17
  **protection** [1] - 79:20
  **Public** [1] - 2:15
  **public** [2] - 7:3, 78:6
  **pull** [4] - 8:18, 37:12,
62:12, 63:18
  **pulled** [9] - 11:20,
18:16, 35:1, 47:13,
47:17, 58:18, 58:22,
58:23, 75:10
  **purpose** [1] - 6:24
  **purposes** [6] - 71:2,
72:4, 73:4, 73:12, 78:15,
78:18
  **pursuant** [1] - 4:10
  **pursue** [1] - 49:17
  **pursued** [1] - 49:15
  **pursuit** [1] - 14:16
  **put** [9] - 13:6, 14:4,
19:18, 29:2, 49:4, 55:16,
69:2, 71:2, 72:4
  **putting** [1] - 62:18

## Q

**questioning** [5] - 7:9, 24:20, 24:21, 57:5, 74:19
**questions** [5] - 21:24, 43:2, 55:20, 69:9, 70:7
**quick** [1] - 82:15
**quite** [3] - 62:8, 80:20
**quoted** [2] - 79:22, 79:23

## R

**radio** [11] - 33:9, 33:10, 33:16, 33:19, 33:20, 38:2, 60:10, 60:12, 60:14, 61:15, 61:16
**raise** [2] - 8:13, 72:16
**raised** [1] - 76:16
**ran** [7] - 17:11, 49:7, 61:13, 63:3, 63:5, 63:10, 73:13
**randomly** [1] - 76:18
**rash** [1] - 79:18
**rather** [1] - 2:2
**Rawlings** [1] - 77:24
**RDB-09-560** [1] - 83:5
**reach** [4] - 32:23, 37:19, 63:8, 80:6
**reached** [2] - 18:12, 18:16
**reaching** [1] - 80:7
**react** [1] - 74:4
**reacted** [1] - 81:4
**reacts** [1] - 80:24
**read** [3] - 56:18, 57:3
**read-out** [1] - 57:3
**ready** [6] - 3:23, 8:8, 8:9, 55:9, 67:8, 70:19
**realized** [2] - 41:25, 42:23
**really** [8] - 30:13, 38:19, 52:17, 61:1, 62:2, 73:6, 73:14, 75:7
**reason** [3] - 7:15, 74:15, 80:22
**reasonable** [1] - 81:9
**reasons** [3] - 81:11, 81:14, 81:17
**received** [1] - 4:13
**recognize** [12] - 6:16, 9:25, 17:5, 20:12, 21:7, 21:13, 45:19, 52:7, 54:7, 63:7, 75:13, 75:16
**recognized** [1] - 18:17
**recollection** [2] - 43:9, 69:17
**record** [16] - 5:14, 5:18,

5:20, 7:3, 8:20, 10:18, 10:20, 23:21, 24:2, 34:7, 42:7, 44:3, 46:17, 59:23, 81:14, 82:3
**recorded** [1] - 83:3
**recover** [4] - 20:25, 21:15, 66:13
**recovered** [11] - 21:17, 39:23, 40:25, 52:8, 54:8, 54:10, 55:11, 64:24, 65:2, 66:7, 66:14
**redirect** [2] - 43:3, 69:11
**REDIRECT** [2] - 43:4, 69:12
**refer** [1] - 31:21
**reference** [5] - 3:3, 47:6, 67:25, 68:7, 78:13
**referred** [1] - 6:3
**referring** [2] - 31:22, 73:2
**reflect** [3] - 5:14, 46:17, 59:23
**regard** [1] - 8:6
**regarding** [1] - 6:9
**regular** [2] - 11:5, 58:15
**relating** [1] - 4:6
**remain** [2] - 8:13, 43:16
**remarkable** [1] - 76:23
**remedy** [1] - 74:21
**remember** [30] - 21:19, 26:18, 26:19, 26:20, 29:6, 30:19, 32:12, 34:15, 37:5, 40:5, 40:8, 40:10, 40:12, 47:25, 55:14, 55:25, 56:4, 57:19, 58:11, 58:12, 64:10, 64:16, 65:7, 65:10, 65:11, 65:12, 67:19, 68:21, 69:1, 75:7
**remembered** [2] - 57:5, 57:6
**rental** [1] - 17:25
**report** [10] - 3:11, 6:9, 6:11, 41:11, 41:13, 41:20, 41:22, 67:4, 67:9, 67:10
**Reported** [1] - 1:22
**Reporter** [1] - 83:15
**REPORTER'S** [1] - 83:1
**reports** [6] - 6:4, 41:15, 41:20, 67:5, 67:14, 67:16
**representation** [2] - 10:4, 45:24
**representations** [1] - 72:5
**request** [1] - 7:1
**required** [1] - 81:5
**requiring** [1] - 6:17
**resemblance** [2] - 74:8,

77:5
**residence** [1] - 59:14
**respect** [5] - 4:8, 4:18, 5:22, 7:13, 72:11, 73:3, 76:4, 76:16, 77:8, 78:24, 79:2, 79:3, 80:10, 80:23, 81:5
**respond** [2] - 6:14, 6:15, 40:1
**retained** [1] - 82:3
**return** [2] - 51:11, 82:2
**returned** [1] - 6:2
**review** [4] - 4:7, 4:8, 5:19, 5:22, 6:18
**reviewed** [3] - 4:4, 4:23, 8:5
**reviews** [1] - 6:21
**revolver** [3] - 53:14, 54:8, 54:9
**rightfully** [1] - 74:4
**rise** [2] - 75:25, 81:9
**roll** [1] - 56:18
**Room** [1] - 1:23
**rotate** [1] - 67:21
**route** [7] - 16:17, 27:20, 28:12, 49:19, 49:23, 51:7, 60:24
**row** [4] - 16:19, 30:3, 58:18, 59:1
**RPR** [1] - 1:22
**run** [11] - 32:17, 32:19, 35:20, 35:22, 35:23, 42:6, 50:1, 51:16, 61:9, 63:8, 74:5
**running** [17] - 15:22, 16:2, 16:3, 17:12, 18:15, 35:12, 48:22, 49:1, 49:13, 50:7, 50:11, 50:18, 50:21, 52:11, 60:4, 61:17, 63:6
**runs** [1] - 31:19
**rust** [2] - 55:4, 55:5
**rusted** [1] - 80:17
**Ryder** [11] - 17:25, 34:2, 34:5, 34:7, 38:7, 38:10, 38:14, 38:16, 38:18, 39:15, 39:25

## S

**safe** [1] - 75:12
**safer** [1] - 6:20
**sanction** [1] - 74:14
**satisfactory** [1] - 5:23
**saw** [27] - 11:9, 11:14, 11:15, 13:15, 18:22, 20:8, 20:25, 21:14, 22:25, 28:17, 35:10, 36:2, 36:6, 38:3, 39:9,

40:17, 42:9, 57:13, 59:8, 59:10, 59:11, 61:20, 62:3, 62:5, 80:23
**scene** [6] - 21:20, 55:12, 65:8, 65:19, 66:15, 79:17
**scheduled** [3] - 5:3, 5:8, 5:9
**screen** [6] - 9:25, 24:1, 27:6, 45:17, 47:3, 71:3
**search** [2] - 42:12, 42:13, 42:16, 53:18, 66:5
**searched** [2] - 66:6, 66:7
**searching** [1] - 69:25
**seated** [4] - 8:17, 39:6, 44:1, 46:15
**second** [2] - 4:3, 51:5
**seconds** [3] - 41:10, 60:5, 70:6
**secure** [2] - 16:2, 55:13
**secured** [3] - 5:15, 55:7, 55:16
**security** [1] - 61:22
**see** [48] - 2:10, 2:11, 2:16, 2:18, 2:25, 6:6, 7:4, 12:6, 13:13, 15:13, 16:15, 18:2, 18:9, 18:14, 19:6, 23:14, 24:1, 24:25, 28:2, 29:13, 34:24, 35:5, 35:11, 36:6, 37:20, 40:14, 45:17, 47:15, 48:4, 48:7, 49:2, 49:4, 49:15, 50:12, 53:8, 53:10, 60:21, 61:25, 62:2, 62:8, 64:1, 64:4, 64:6, 67:12, 72:11, 76:5, 76:18
**seeing** [3] - 3:6, 21:19, 56:14
**seek** [1] - 78:7
**seize** [1] - 75:25
**seized** [9] - 73:4, 73:14, 73:18, 75:16, 75:19, 78:15, 78:18, 78:21
**seizure** [4] - 77:9, 77:12, 78:9, 80:3
**send** [1] - 6:13
**sense** [4] - 43:9, 43:10, 69:17, 79:14
**sent** [2] - 56:22, 60:16
**set** [3] - 2:8, 79:1, 81:14
**sheet** [11] - 3:8, 22:21, 22:25, 23:2, 23:3, 23:5, 24:6, 24:11, 24:13, 56:10, 56:24
**sheets** [1] - 22:21
**shift** [5] - 9:13, 44:19, 44:20, 65:13, 68:2
**shining** [2] - 32:10,

32:11
**shirt** [3] - 10:17, 76:25, 77:1
**shooting** [12] - 11:10, 22:15, 22:20, 24:10, 24:12, 31:1, 31:3, 31:17, 42:1, 47:7, 55:25, 56:3
**shopping** [1] - 64:6
**short** [1] - 6:13
**show** [22] - 9:23, 13:21, 14:12, 16:17, 17:1, 18:19, 19:11, 20:11, 20:24, 21:6, 49:9, 49:19, 51:6, 51:13, 51:17, 52:6, 52:24, 54:6, 56:7, 63:7, 78:15
**showed** [1] - 40:10
**showing** [4] - 17:4, 23:5, 65:12, 69:16
**shown** [1] - 56:8
**shrubbery** [1] - 20:21
**side** [1] - 31:25
**sidewalk** [3] - 49:14, 50:2, 61:2
**sight** [4] - 14:20, 16:9, 53:18, 60:19
**sign** [4] - 67:13, 67:16, 81:15, 81:20
**signature** [1] - 83:10
**simply** [4] - 73:16, 74:14, 74:18, 77:25
**sirens** [1] - 69:4
**sit** [1] - 34:13
**sits** [1] - 33:12
**sitting** [3] - 10:16, 10:20, 21:14
**situation** [3] - 25:7, 25:8, 74:12, 76:18
**situations** [1] - 6:17
**six** [3] - 67:21, 67:23, 68:19
**skate** [2] - 76:5, 76:7
**skip** [1] - 48:17
**skipping** [5] - 48:18, 49:12, 59:17, 59:24, 59:25
**slightly** [1] - 51:5
**slow** [3] - 35:20, 35:24, 75:19
**slowed** [2] - 18:12, 35:21
**slowing** [1] - 75:21
**slowly** [1] - 13:4
**slumped** [1] - 50:20
**small** [1] - 16:21
**smiling** [1] - 76:5
**Smith** [3] - 40:8, 40:9, 65:10
**solid** [1] - 19:2
**someone** [8] - 22:14,

46:11, 50:21, 56:23,
73:17, 74:14, 75:15,
80:15
   **sometimes** [2] - 67:17,
67:18
   **somewhere** [2] - 51:10,
62:12
   **sorry** [5] - 18:25, 47:2,
47:4, 48:15, 58:25
   **sort** [2] - 35:24, 37:2
   **south** [1] - 16:3
   **southbound** [2] -
15:20, 50:4
   **southwest** [1] - 9:8
   **Southwest** [3] - 44:14,
44:22, 68:4
   **Southwestern** [5] -
22:5, 40:20, 42:22,
66:21, 68:12
   **speaking** [1] - 48:16
   **speciality** [1] - 68:9
   **specifically** [4] - 31:22,
78:17, 81:3, 81:4
   **specifics** [1] - 7:15
   **speed** [1] - 29:8
   **speeding** [1] - 58:14
   **spell** [3] - 8:19, 8:22,
44:3
   **spike** [1] - 45:14
   **spot** [2] - 12:1, 39:5
   **squad** [3] - 38:14, 68:2,
68:9
   **Squad** [1] - 68:11
   **staff** [1] - 82:14
   **stairs** [2] - 13:11, 57:13
   **stand** [3] - 43:18, 70:12,
73:17
   **standard** [1] - 79:17
   **standards** [1] - 79:12
   **standing** [15] - 8:13,
17:9, 47:5, 59:15, 64:16,
72:16, 73:9, 77:9, 77:12,
77:22, 78:1, 78:9, 80:2,
80:3
   **stands** [2] - 82:13,
82:18
   **start** [2] - 29:4, 77:7
   **started** [15] - 11:4,
11:20, 13:4, 13:11,
13:18, 14:2, 14:8, 14:13,
16:3, 33:2, 48:22, 49:12,
59:18, 60:4
   **starting** [1] - 14:3
   **state** [2] - 8:19, 44:2
   **statements** [1] - 21:22
   **STATES** [2] - 1:1, 1:4
   **States** [9] - 2:6, 2:8, 4:9,
5:20, 77:13, 77:15,
77:17, 79:7, 79:24
   **station** [5] - 22:24,

46:25, 58:14, 58:16, 65:5
   **stay** [2] - 33:3, 60:8
   **stenographically** [1] -
83:4
   **step** [6] - 6:17, 22:13,
27:15, 43:14, 58:21, 70:9
   **steps** [5] - 47:14, 49:11,
49:12, 59:14, 59:21
   **Stevenson** [1] - 77:15
   **still** [19] - 2:25, 3:15,
12:11, 16:13, 18:4, 25:5,
26:1, 31:16, 39:2, 39:4,
58:5, 58:7, 58:15, 62:6,
63:4, 64:4, 66:3, 74:11
   **stomach** [1] - 39:7
   **stood** [3] - 52:2, 64:18,
66:6
   **stop** [3] - 24:23, 62:12,
75:17
   **stopped** [9] - 11:24,
12:1, 25:3, 28:6, 28:8,
47:21, 51:14, 57:14,
61:22
   **Street** [7] - 1:23, 11:5,
45:23, 46:24, 47:8,
49:14, 55:12
   **street** [18] - 14:24,
15:14, 16:11, 17:24,
18:1, 23:14, 34:5, 34:10,
34:14, 39:15, 47:21,
50:10, 50:14, 50:15,
60:25, 61:3, 76:19, 78:6
   **striking** [1] - 74:8
   **strip** [1] - 11:7
   **strokes** [1] - 3:1
   **strong** [3] - 71:15,
76:17, 77:5
   **struck** [1] - 57:10
   **stuck** [1] - 62:6
   **stuff** [4] - 20:7, 20:23,
42:7, 42:8
   **subdue** [1] - 19:18
   **subdued** [1] - 19:23
   **submission** [2] - 73:6,
74:4
   **submit** [3] - 19:14,
55:18, 76:14
   **submits** [1] - 78:19
   **submitted** [3] - 4:7,
67:5, 67:6
   **summarized** [2] - 4:25,
7:20
   **summertime** [3] -
52:16, 52:17, 64:11
   **supporting** [1] - 78:3
   **supposed** [4] - 11:10,
24:14, 24:16, 68:6
   **suppress** [4] - 3:8,
3:14, 81:12, 81:18
   **suppression** [3] - 5:3,

7:18, 72:16
   **Supreme** [9] - 4:10,
77:17, 77:24, 77:25,
79:1, 79:5, 79:22, 79:23
   **surprisingly** [1] - 70:5
   **surrenders** [1] - 78:4
   **suspect** [11] - 11:10,
31:1, 31:3, 31:17, 37:24,
42:1, 47:6, 55:25, 56:3,
61:18, 77:19
   **suspects** [1] - 22:22
   **suspicion** [1] - 81:9
   **sustained** [1] - 6:8
   **switch** [1] - 27:1
   **SWORN** [2] - 8:15,
43:24

## T

   **table** [2] - 2:9, 10:21
   **tackle** [2] - 36:22, 74:6
   **tackled** [2] - 19:13,
28:20
   **tag** [1] - 54:10
   **talkie** [3] - 33:7, 33:22,
34:1
   **talks** [1] - 33:22
   **taller** [1] - 57:14
   **tangible** [2] - 3:14,
81:12
   **taught** [2] - 75:2, 75:10
   **teach** [1] - 3:1
   **tech** [1] - 27:2
   **technicians** [2] - 41:3,
66:10, 66:12
   **temporarily** [1] - 75:20
   **ten** [4] - 12:16, 14:19,
16:8, 19:12
   **tending** [1] - 4:11
   **terminates** [1] - 17:15
   **terms** [6] - 6:18, 71:22,
76:6, 76:24, 78:11, 78:12
   **test** [1] - 79:1
   **testified** [3] - 72:11,
76:10, 80:22
   **testifies** [1] - 7:17
   **testifying** [1] - 43:8
   **testimony** [8] - 3:23,
8:7, 43:15, 69:20, 70:10,
75:18, 75:21, 80:9
   **THE** [89] - 1:1, 1:1, 2:2,
2:10, 2:16, 2:24, 3:3,
3:11, 3:12, 3:19, 3:22,
4:2, 4:16, 4:18, 5:7,
5:12, 6:12, 7:6, 7:11,
7:24, 8:3, 8:12, 8:13,
8:16, 8:17, 8:21, 8:22,
8:23, 8:25, 9:2, 10:20,
10:22, 10:23, 21:5,

21:25, 23:17, 23:20,
23:25, 27:4, 27:8, 27:13,
41:17, 43:3, 43:14,
43:19, 43:20, 43:25,
44:1, 44:4, 44:6, 44:10,
44:25, 45:4, 45:8, 46:17,
54:5, 55:21, 58:20,
59:23, 67:1, 69:11, 70:8,
70:13, 70:14, 70:17,
70:19, 70:22, 70:25,
71:7, 71:14, 71:20, 72:2,
72:7, 72:13, 72:23, 73:2,
73:8, 74:22, 75:3, 76:2,
76:4, 76:12, 76:15,
81:24, 82:1, 82:4, 82:5,
82:9, 82:13
   **themselves** [3] - 4:19,
5:1, 6:23
   **therefore** [2] - 77:19,
82:13
   **thin** [2] - 76:5, 76:7
   **thinking** [1] - 6:1
   **thinnest** [1] - 75:18
   **thinning** [1] - 75:13
   **thins** [1] - 75:17
   **thirty** [1] - 17:16
   **Three** [3] - 20:12, 36:9,
52:7
   **three** [1] - 16:22
   **threw** [6] - 18:17, 39:11,
39:12, 52:3, 73:13
   **throw** [3] - 20:8, 28:18,
73:18
   **throwing** [1] - 35:15
   **thrown** [2] - 35:4, 39:3
   **throws** [3] - 35:12, 78:5
   **tinted** [5] - 26:20, 26:21,
26:22, 68:24, 68:25
   **today** [11] - 5:25, 8:2,
21:14, 52:14, 69:21,
77:1, 77:6, 81:17, 81:20,
82:16, 82:17
   **today's** [2] - 5:3, 5:13
   **ton** [1] - 65:15
   **took** [10] - 37:9, 39:5,
41:8, 41:23, 49:20, 51:7,
53:22, 64:21, 64:23, 67:7
   **top** [7] - 25:21, 53:16,
53:25, 54:23, 56:2,
56:11, 59:15
   **tossed** [1] - 75:22
   **totality** [3] - 78:25, 79:2,
79:10
   **totally** [1] - 80:13
   **toward** [1] - 61:9
   **towards** [10] - 13:4,
15:23, 17:12, 48:20,
52:25, 53:1, 53:13,
56:12, 59:25, 60:15
   **trailers** [1] - 14:15

   **transcribed** [1] - 83:7
   **transcript** [1] - 83:7
   **transportation** [1] -
40:21
   **transported** [2] - 21:20,
66:19
   **trash** [4] - 20:22, 36:14,
54:17, 54:18
   **Travan** [1] - 65:10
   **traveled** [1] - 50:4
   **traveling** [3] - 15:16,
29:10, 46:25
   **Travon** [2] - 40:8, 40:9
   **trees** [2] - 20:23, 52:16
   **trial** [3] - 5:8, 5:16,
10:21
   **trip** [1] - 36:19
   **truck** [3] - 17:25, 39:15,
39:25
   **truthfully** [1] - 80:22
   **try** [9] - 23:10, 23:12,
23:13, 30:12, 61:9, 76:17
   **try-up** [3] - 23:12
   **trying** [6] - 16:1, 37:1,
61:17, 71:8, 76:6, 80:15
   **tuck** [1] - 58:3
   **tucked** [1] - 58:7
   **turn** [12] - 11:6, 11:13,
18:15, 28:1, 29:5, 30:8,
32:6, 35:21, 35:25,
47:12, 67:8, 79:23
   **turned** [6] - 6:23, 14:1,
48:21, 49:13, 60:25,
61:21
   **turning** [2] - 48:17, 49:1
   **turns** [1] - 18:20
   **two** [6] - 6:3, 22:8,
22:12, 27:7, 39:20, 67:11
   **Two** [5] - 17:2, 17:5,
27:8, 27:10, 63:7
   **twos** [1] - 67:24
   **type** [2] - 33:25, 81:7
   **types** [1] - 41:20
   **typical** [1] - 54:16

## U

   **U-turn** [4] - 11:13, 28:1,
30:8, 47:12
   **U.S** [9] - 1:23, 4:9, 73:3,
77:14, 77:25, 78:14,
79:13, 79:21, 79:24
   **um-hum** [1] - 28:25
   **unclear** [1] - 71:14
   **under** [13] - 28:22,
37:10, 38:1, 41:25,
51:22, 62:18, 63:13,
78:12, 78:23, 78:25,
79:12, 79:14, 80:12

**undercover** [1] - 26:11
**underneath** [1] - 25:20
**understood** [1] - 69:25
**undertaken** [1] - 78:12
**undisputed** [2] - 75:3, 76:12
**unfortunately** [1] - 74:21
**unfounded** [1] - 79:19
**uniform** [2] - 9:15, 46:5
**uniformed** [5] - 40:1, 40:19, 62:20, 65:1, 66:18
**Unit** [3] - 24:25, 68:11, 68:12
**United** [9] - 2:6, 2:8, 4:9, 5:20, 77:13, 77:15, 77:17, 79:7, 79:24
**UNITED** [2] - 1:1, 1:4
**units** [1] - 65:5
**unlawfully** [1] - 73:20
**unloaded** [1] - 55:13
**unmarked** [5] - 9:18, 26:15, 46:6, 69:5, 75:2
**unreasonable** [1] - 79:18
**up** [50] - 6:2, 11:3, 11:14, 11:20, 14:20, 18:25, 23:10, 23:12, 36:20, 39:10, 40:10, 41:5, 41:6, 42:7, 46:23, 47:1, 47:13, 47:17, 49:1, 49:7, 50:16, 50:23, 51:5, 51:7, 51:10, 52:1, 52:2, 54:2, 55:1, 55:6, 56:23, 57:13, 58:18, 59:11, 61:6, 64:16, 64:18, 65:12, 66:6, 67:22, 71:3, 71:6, 72:19, 74:18, 74:23
**USA** [1] - 83:4
**utility** [2] - 26:4, 26:5

## V

**vehicle** [16] - 9:18, 12:9, 12:11, 28:6, 28:8, 28:9, 33:6, 38:15, 46:6, 48:5, 49:18, 51:9, 59:5, 75:2, 75:9
**vehicles** [2] - 63:1, 74:2
**vendetta** [1] - 80:14
**veracity** [1] - 6:9
**verbally** [1] - 76:11
**verify** [1] - 42:3
**verifying** [1] - 71:10
**versus** [1] - 2:7
**vest** [5] - 12:19, 25:18, 25:20, 58:1, 58:2
**view** [6] - 3:16, 3:20, 45:22, 59:16, 82:6, 82:10

**violence** [2] - 68:1, 68:7
**violent** [1] - 45:14
**visually** [1] - 29:13

## W

**wagon** [2] - 40:22, 66:19
**waist** [5] - 31:12, 31:23, 48:14, 48:22, 50:20
**waistband** [9] - 13:12, 13:15, 15:24, 25:25, 31:21, 31:23, 48:21, 50:20, 80:7
**wait** [1] - 7:3
**walked** [4] - 20:10, 53:23, 55:12, 66:8
**walkie** [3] - 33:7, 33:22, 34:1
**walkie-talkie** [3] - 33:7, 33:22, 34:1
**walking** [5] - 47:1, 48:16, 48:20, 59:11, 59:14
**walks** [1] - 74:23
**warm** [1] - 30:19
**warrant** [1] - 57:5
**warrantless** [3] - 79:3, 79:11, 81:10
**watch** [1] - 69:24
**WATF** [1] - 23:10
**ways** [1] - 25:9
**weapon** [12] - 12:25, 13:8, 14:6, 16:2, 20:25, 21:17, 37:15, 41:9, 49:2, 55:10, 67:7, 75:24
**wear** [4] - 31:10, 58:2, 58:3
**wearing** [9] - 10:17, 25:17, 26:2, 55:14, 57:25, 73:22, 75:6, 75:8, 77:1
**wee** [1] - 77:10
**weeds** [1] - 20:23
**weekend** [2] - 68:7, 82:19
**west** [2] - 11:6, 16:24
**West** [1] - 1:23
**westbound** [2] - 46:25, 52:11
**whereas** [2] - 4:19, 6:16
**Whereof** [1] - 83:9
**whole** [2] - 6:24, 60:20
**Wilkens** [18] - 9:22, 10:3, 11:4, 11:7, 11:21, 13:23, 14:14, 15:16, 16:24, 45:22, 46:12, 47:4, 49:2, 49:7, 49:20, 49:24, 60:11

**willing** [1] - 6:15
**windows** [10] - 26:20, 26:21, 26:22, 30:20, 30:21, 30:24, 57:19, 57:20, 68:24, 68:25
**WITNESS** [10] - 8:15, 8:16, 8:21, 8:23, 10:22, 43:19, 43:24, 43:25, 44:4, 70:13
**witness** [15] - 4:11, 10:23, 21:4, 27:19, 27:22, 28:4, 28:19, 28:21, 29:3, 43:18, 43:21, 46:18, 46:19, 59:23, 70:11
**Witness** [1] - 83:9
**witnesses** [1] - 70:17
**wonderful** [2] - 28:9, 29:4
**worried** [1] - 37:24
**worrying** [1] - 69:23
**wrapped** [1] - 36:25
**wrestled** [1] - 19:17
**write** [4] - 41:13, 41:15, 67:4, 67:5
**writes** [2] - 67:14, 67:16
**writing** [3] - 6:1, 6:9, 6:11
**written** [3] - 41:21, 41:22, 56:12
**wrote** [4] - 41:11, 54:11, 67:9, 67:10

## Y

**yard** [2] - 34:3, 34:5
**yards** [1] - 30:13
**year** [4] - 64:9, 67:12, 68:17
**years** [6] - 3:5, 9:10, 22:6, 22:8, 22:12, 44:16
**yelled** [1] - 61:19
**yelling** [1] - 61:18
**yourself** [1] - 31:8

## Z

**Zajac** [3] - 1:22, 83:3, 83:14